[No. 13825. Department Two. June 6, 1917.]

ROBERT WORDEN et al., Appellants, v. EARL WORDEN et al., Respondents, THE UNKNOWN HEIRS OF ATA WORDEN et al., Defendants.[1]

HUSBAND AND WIFE—CONVEYANCES BETWEEN—SEPARATION AGREEMENT—SEPARATE PROPERTY. A separation agreement whereby a husband and wife respectively convey to each other all community interest in real estate which was in fact the separate property of the grantee, reciting that each shall hold, as his or her separate property, the lands conveyed and all property subsequently acquired by each, warrants a finding that the properties conveyed and all subsequent accumulations by either are his or her separate estate.

SAME — CONVEYANCES BETWEEN — SEPARATE PROPERTY — SEAL. A separation agreement affecting only separate property of the spouses need not be sealed, even conceding that the statute abolishing seals, Rem. Code, § 8751, is not operative as to conveyance of community property between husband and wife.

SAME—SEPARATION AGREEMENT—VALIDITY—PUBLIC POLICY. A separation agreement whereby husband and wife, owing to differences, agree to live separate and apart, and adjusting their property rights, is not void as against public policy, where it provides for an immediate separation.

[1]Reported in 165 Pac. 501.

SAME — SEPARATION AGREEMENT — CONSIDERATION. A separation agreement providing for mutual conveyances of property is not void for want of consideration because no money passed.

DEEDS—DESCRIPTION—SUFFICIENCY. A conveyance by general description of all real estate in the state of Washington the record title of which is in the grantee, is adequate for the purpose of identifying the land intended to be conveyed, especially as between the parties.

WILLS—CONTRACT TO DEVISE—EVIDENCE — SUFFICIENCY. An oral agreement to will property to a son in consideration of life support, is sustained by proof of conversations with the testator showing his agreement to that effect, followed by the making of the will and the son's taking possession and making permanent improvements, and performance of the contract on his part; the same degree of convincing evidence not being required where the confirmatory will was made.

SPECIFIC PERFORMANCE — ORAL AGREEMENT TO DEVISE LAND — EQUITY. It is within the equity jurisdiction to compel specific performance of a contract to devise land in consideration of a parol agreement for life support which has been already performed or partly performed.

FRAUDS, STATUTE OF—ORAL CONTRACT TO DEVISE LAND—PART PERFORMANCE—EVIDENCE. The making of a will in pursuance of an oral agreement to devise land is not a sufficient performance of the contract to take the same out of the operation of the statute of frauds, but is admissible in evidence in support of other evidence tending to establish the contract; and there is sufficient part performance where the devisee went into possession, made permanent improvements and fully performed the agreement on his part.

WILLS—ORAL CONTRACT TO DEVISE LANDS—SPECIFIC PERFORMANCE —HEIRS AS TRUSTEES. Where a testator, pursuant to an oral agreement, attempted to devise land in consideration for life support, and the devisee went into possession, made permanent improvements, and fully performed the agreement on his part, on failure of the will, the heirs hold as trustees and can be compelled to specifically perform the contract by making a proper conveyance pursuant to the contract.

Appeal from a judgment of the superior court for Whatcom county, Hardin, J., entered June 13, 1916, upon findings in favor of the defendants, in an action for specific performance, tried to the court. Reversed.

*R. J. Nightingale* and *H. S. Nightingale*, for appellants.

*Hurlbut & Neal*, for respondents.

FULLERTON, J.—On January 12, 1914, Ata Worden executed his last will and testament, devising to his nephew Robert Worden the south half, and to his nephew Elmer Worden the north half, of the northeast quarter of the southwest quarter of section 15, township 39 north, range 2 west, W. M.   The will also provided that his horses should go to Robert Worden and his notes and mortgages to the brother of the testator, Dudley Worden, his cattle should be distributed equally between Dudley Worden, his nephews, Robert and Elmer Worden, and the two wives of the nephews, and the residue of his estate of whatever nature should go to his nephews, Robert and Elmer, and to his brother, Dudley, equally.   The will further provided:

"In making this, my last will and testament, I am not unmindful of my wife Nellie Worden, but do not care to leave her anything, and mention her here simply to show that she was not forgotten by me in making this my last will."

Ata Worden died July 20, 1914, and his will was duly probated on August 7, 1914.   His widow, Nellie Worden, learning that Earl Worden Chafee (formerly Earl Worden) and Lloyd C. Worden, two sons by a former marriage, were living, notified them of their father's death, and on September 14, 1914, a contest of the will was instituted by the widow and these two sons.   Upon the hearing of this contest, the will was set aside on the ground that it failed to name or provide for such sons, and the estate declared intestate.   The court in probate refused to pass upon the claim of the widow to a community interest in the estate left by Ata Worden.

Robert Worden and Jennie Worden, his wife, thereupon brought an action against the heirs, widow, and executor of Ata Worden to enforce performance of an alleged oral agreement to devise to Robert the south half of the forty acres described in the will.   Among other things, the complaint set up an instrument executed by Ata Worden and Nellie Worden on June 19, 1911, declaring that all real estate held by the parties was the separate property of the one in whose

name it was standing, and that all property thereafter acquired should be the separate property of the one acquiring it. The answer set up as an affirmative defense that this instrument was obtained by deception and fraud and that there was no consideration to sustain it. This was denied in the reply, which also alleged that no instrument was ever recorded by defendant Nellie Worden claiming any community interest in the property of Ata Worden, that she had received and retained all of her share of the community property under a division agreement with her husband, and that she was estopped to claim a community interest in the property in controversy. On the trial, the court found that the defendant Nellie Worden had a community interest in the property, that Ata Worden made no contract to devise his property, and that plaintiffs had made improvements on the property to the value of $185, and had rendered personal services to the decedent to the value of $645, and that the rental value of their use and occupation of the land was $230, leaving a net amount due plaintiffs of $600. Decree was rendered denying specific performance of the oral agreement, quieting title in Nellie Worden to an undivided one-half, and in Earl Worden Chafee and Lloyd C. Worden, the sons of Ata Worden, to an undivided one-fourth each, awarding plaintiffs judgment for $600, and making the same a lien on the land. The plaintiffs appeal, assigning as error certain findings of fact and conclusions of law of the court, the refusal to make findings and conclusions requested by plaintiffs, and the making of its decree based thereon.

The appellants claim that the following finding made by the court is contrary to the evidence:

"That the property hereinbefore described or mentioned and all the property in which the said Ata Worden was interested at the time of his death was acquired during the time of the marriage relation with the defendant Nellie Worden and by the joint efforts of the said husband and wife; and was the community property of the said Ata Worden and said defendant Nellie Worden."

The evidence shows that Ata Worden and Nellie Worden were formerly residents of the state of Michigan and intermarried there in the year 1884. At the time of marriage, Nellie Worden possessed no property, and Ata Worden was possessed of property which, prior to his removal to the state of Washington in 1889, he sold for $2,500. Of this money, the sum of $400 was applied in paying off a $300 mortgage on a thirty-acre farm in Michigan belonging to the parents of his wife, Nellie, and $100 was given them in cash. The title to this land, in the year 1907, seems to have been vested in the Wordens, but the evidence does not clearly disclose how it was acquired, other than by this payment out of Ata Worden's separate funds. The balance of the proceeds of his sale of his own Michigan property to the extent of from $1,800 to $2,000 was laid out in the purchase and equipment of a twenty-two acre farm in Skagit county, Washington, on which the parties made their home. Domestic trouble arising between the parties, they agreed to separate and divide their holdings. Accordingly, on June 10, 1907, Nellie Worden quitclaimed to Ata Worden the thirty-acre farm in Michigan, waiving all claim for dower, and Ata Worden quitclaimed to Nellie Worden the home farm in Skagit county, reciting his intention to convey all community interest in that property. Nellie Worden remained in possession of the Skagit county property as her home, farming it with the help of a hired man and retaining all the revenues therefrom. Ata Worden left for Whatcom county, where he took up his residence, and husband and wife never thereafter lived together. Shortly after the division of property, Ata Worden exchanged the Michigan land for a farm near Lynden, in Whatcom county, which he subsequently sold, and the proceeds of the sale were invested in another farm in Ten Mile township. Since there was nothing of record in Whatcom county showing his right to transfer real estate as sole owner, it was always necessary to get his wife to sign

his deeds, so he had her join him in the execution of a deed purporting to convey to one another all community interest that each might have in the real estate held by the other. This agreement is as follows:

"This Agreement made and entered into this 19th day of June, 1911, by and between Ata Worden, sometimes known as 'Atta Worden,' the party of the first part, and Nellie Worden, the wife of said Ata Worden, the party of the second part;

"Witnesseth: That Whereas, the above named parties are husband and wife, and;

"Whereas, differences have developed making it impossible for said parties to longer live together, and said parties having agreed to live separately;

"Now, Therefore, in consideration of the mutual promises made herein, the one to the other, the said parties do agree that hereafter the said parties will live separate and apart from each other, and that any and all property which may be acquired by either of said parties shall be considered as the sole and separate property of the party acquiring the same, and relieved of any and all interest which the other party to this agreement might have by reason of the community existing between the parties hereto.

"Said party of the first part does hereby grant, bargain, sell and convey unto the said party of the second part all of his community right, title and interest in and to all real estate situated in the state of Washington and now standing in the name of the party of the second part, and the said party of the second part does hereby grant, bargain, sell and convey unto the said party of the first part all of her community right, title and interest in and to all real estate situated in the state of Washington the record title to which may be in the name of the said party of the first part.

"It is mutually agreed by and between the said parties, and it is the intention of the parties hereto, that from this day henceforth the said parties shall each have the right to acquire and sell property and to transact business in all manner the same as if the parties hereto were unmarried persons.

"In Witness Whereof, the said parties have hereunto set their hands and seals this 19th day of June, 1911.

Witness:                          Ata Worden
   "H. C. Thompson.              Nellie Worden."

This was filed for record August 1, 1911, and duly recorded in the records of Whatcom county. Having sold his farm in Ten Mile township, Ata Worden, on January 30, 1912, invested the proceeds in a farm near Ferndale, Whatcom county, described as the northeast quarter of the southwest quarter of section 15, township 39 north, range 2 east, W. M., comprising the land in controversy in this action. Here Ata Worden lived alone and cultivated the land until December, 1913, when, owing to his impaired physical condition, he was compelled to call his nephew Robert Worden to his assistance.

We think this evidence clearly establishes that the lands in controversy were the separate property of Ata Worden. So far as the evidence discloses, the Michigan land was his separate property at the inception of its ownership. But conceding that his wife had an interest therein, she conveyed it to him absolutely by her deed of June 10, 1907, an instrument which she nowhere questions. This was given by her in exchange for a deed making her the separate owner of a farm that had been bought with the money of Ata Worden in which she had no community interest. The Michigan land being the separate property of Ata Worden, the farm near Lynden, acquired by him in exchange for his Michigan farm, would also be separate property. The land in controversy, through all mesne conveyances, is shown to be the proceeds of property originally held in separate ownership, and under the rule in this state, the original character of property held by a married person attaches to the proceeds of that property.

In *United States Fidelity & Guaranty Co. v. Lee*, 58 Wash. 16, 107 Pac. 870, we state the rule as follows:

"Where property is acquired during marriage, the test of its separate or community character is whether it was acquired by community funds and community credit, or separate funds and the issues and profits thereof; . . ."

See, also, *In re Deschamps' Estate*, 77 Wash. 514, 137 Pac. 1009; *Guye v. Guye*, 63 Wash. 340, 115 Pac. 731, 37 L. R. A. (N. S.) 186.

But if there were any doubt as to the separate character of the property in this state acquired with the proceeds of the Michigan land conveyed to him by his wife in 1907, that doubt is completely dispelled by the execution of the instrument of June 19, 1911, in which Nellie Worden purported to convey to Ata Worden "all of her community right, title and interest in and to all real estate situated in the state of Washington, the record title of which may be in the name of" Ata Worden. Recognizing the effectiveness of this instrument as a declaration against any community interest, respondent Nellie Worden attacked it from every angle. She pleaded that it was procured by fraud and deception and without consideration. She testified there was no money consideration, but there was no evidence of fraud introduced. Before the trial court it was urged that the instrument was invalid under Rem. Code, § 8766, because the signatures of the parties were not sealed as required by that statute; that the contract was void as being against public policy, in that it was given in consideration of the dissolution of the marriage relation and that it attempted to convey a community interest by a general, instead of by a specific, description. The trial court held that the instrument was contrary to public policy, and hence void and without force or effect for any purpose.

Under the facts in this case, the instrument dealt only with the separate property of the parties. The land in Nellie Worden's name was her separate property by reason of the deed of 1907 from her husband. The land in Ata Worden's name was his separate property because it was the proceeds of what was concededly separate property belonging to him. The object of executing the instrument was that it might be placed of record in Whatcom county, so that Ata Worden as a married man would not be under the neces-

sity of procuring his wife's signature to every transfer of real estate made by him, and the evidence discloses he was an active trader. It is nothing more than confirmatory of the titles standing in their respective names as constituting separate property. It amounts to notice to the world of the separation of husband and wife, and of an agreement between them that all after-acquired property acquired by either shall be the sole and separate property of the party acquiring it. As the instrument does not in fact affect community property, there was no necessity that seals be attached to the signatures of the makers, even if we were to concede that Rem. Code, § 8751, abolishing private seals was not operative as to conveyances of community property between husband and wife. See *Powers v. Munson*, 74 Wash. 234, 133 Pac. 453.

Further, we think the trial court was in error in holding the agreement of June 19, 1911, void as against public policy. It merely recited the inability of husband and wife to live together, with their agreement to live separately, and was an adjustment of property rights in view of that situation of affairs.

"The great majority of the American decisions distinguish between agreements for future and agreements for immediate separation, holding that agreements for separation of husband and wife are valid if made in prospect of an immediate separation, but illegal if they provide for a possible separation in the future; . . ." 9 Cyc. 520.

The agreement itself recites the consideration upon which it was based, and any claim of Nellie Worden that Ata Worden failed to pay her any money for entering into it is wholly without merit. The instrument is strong declaratory evidence against interest on the part of Nellie Worden.

Objection is made that this agreement between the spouses is insufficient because it attempts to convey by general, instead of specific, description of the land. If it were in fact a conveyance, it recites that Nellie Worden "does hereby

grant, bargain, sell and convey unto said party of the first part [Ata Worden] all of her community right, title, and interest in and to all real estate situated in the state of Washington, the record title of which may be in the name of said party of the first part." Such description was fully adequate for the purpose of identifying the land intended, especially as between the parties. *Butrick v. Tilton*, 141 Mass. 93, 6 N. E. 563; *Harvey v. Edens*, 69 Tex. 420, 6 S. W. 306; *Brown v. Warren*, 16 Nev. 228; *First Nat. Bank of Attleboro v. Hughes*, 10 Mo. App. 7.

We do not think it necessary to invoke the principle of estoppel in this case, although there are circumstances sufficient to preclude the assertion by the widow of a community interest in the land. She not only executed the two deeds declaring to the world she had no interest in lands in Ata Worden's name, but she has failed to make and file for record à declaration of a community interest in any lands held by him. She has also taken and farmed for seven years the improved land given by him to her, and taken to herself all the revenue thereof. She had knowledge that Robert Worden and wife were living on and farming the land and taking care of her enfeebled husband with the understanding that Robert was to have the land on her husband's death, yet she failed to notify him that she claimed a community interest in the property, or to file for record a public declaration to that effect. We think it is clear from the evidence that the land devised by Ata Worden was his separate property in which his wife Nellie Worden is not entitled to assert any community interest.

We think also the finding of fact, that "Ata Worden, during his lifetime, did not make an agreement with plaintiffs to leave them or either of them any property by last will and testament," was contrary to the evidence. The agreement was an oral one, and Robert and Elmer Worden and their wives, as parties to the contract with the decedent, Ata Wor-

den, were precluded from testifying to its terms, as was also the attorney who drew the will from testifying to the purpose of the testator in executing it. There is, however, abundant testimony of other witnesses as to declarations of the decedent that he intended to leave his land to his two nephews for taking care of him in his old age and during his helpless condition, and also of declarations that he had made the will for that purpose. Robert Worden took possession of and operated the south twenty acres as if it were his own, and made permanent improvements which the court found were of the value of $185, besides farming the land and sharing the proceeds with his uncle. The court also found that the care and assistance rendered the uncle by Robert Worden and his wife were of the value of $645. Dudley Worden, the brother of the testator and father of Robert Worden, was present at the time the agreement between uncle and nephew was entered into. He testifies:

"Ata said: 'Robert made a proposition to support me for this twenty we are living on, and the stock and farming utensils. What do you think about it?' and I said, 'I think it is up to you parties. If you agree to it I think it is all right.' And he said, 'Do you think he would,' and I said, 'I think he would.' And he said, 'You know Robert is under age. Do you think he would do it?' and I said, 'I think he would do it if he said he would, and as far as I am concerned I am willing to assist him what I can in that,' and he said, 'All right, let's talk it over together,' and he told me to call Robert in. Ata said to Robert, 'I was telling your father the proposition you made me about taking this twenty and supporting me.' And Robert said, 'Yes, I told him I would take and support him for this twenty, and the stock, and things that went with it to work it with. I am ready to do it and I am doing it.' And Ata said, 'Now, your father says that he thinks it is all right. Now, Robert, you go ahead and work this twenty just as if it was your own, and I will see you have it when I am done with it, so you will get it when I am done with it,' and Robert said, 'All right. Father hears this, so it is all right.' That is about all the conversation of that of any importance at that time."

The same witness testified of a later conversation with Ata Worden concerning the matter, as follows:

"He wanted to know how was the best way to fix it up, and he wanted to know what I thought about it, and I said, 'I don't know. If Robert is to have this, you had better see a lawyer; of course he needs some papers.' And he said, 'I guess I will make a will; I don't like to deed it while I am living; I would like to keep it in my own name while I am living.' . . . About the 11th of January, 1914, . . . he went over to Elmer's and he was talking about making out papers, he was getting so bad. Ata stayed with Elmer, and next day Ata and Elmer came down here [Bellingham] and had the will made out. . . . and going home he said, 'I made out the papers today. I made out a will. Robert gets the south twenty.' And he said, 'I can't talk very well; Elmer can tell you about it.' "

Edward W. Swanson, a merchant of Ferndale, testified of a conversation with Ata Worden, as follows:

"I raised the question of Robert Worden, about his wanting to open an account and establish a line of credit because he was taking care of the old man, and I asked him about this, and Ata Worden told me that it would be all right, because he was going to take care of him and he would have the place. Just before that I said, 'That is mighty nice, Robert staying there and taking care of you,' and he said, 'Yes, it is, and he will have the place.' That is about the extent of the conversation."

Joe Joyt testified:

"Ata said he would give Robert twenty acres of land if he would take care of him, because he had to have somebody take care of him."

Harold Williams testified:

"I knew Ata Worden. I was at his place working for Robert in 1913, about November. I stayed there two weeks, cutting poles and doing general farm work. Ata told me he intended to give Robert Worden that home place and also Elmer Worden the other twenty for taking care of him the balance of his days. . . . Robert farmed the place and

built a fence and a woodshed and wagonshed. I helped him build the woodshed. Robert employed me and paid me."

William Carr testified:

"I stopped at that farm in April, 1914, to trade or sell horses to Bob. I talked with Ata Worden. . . . He said, 'I am not able to do anything, Billie, any more. In fact, I can't cook my own meals. I have to have somebody here, you know, and I got the boys on here and if they will go ahead and farm this thing, and do what is right, there is a good living in it for all of us, and when I get done with it it shall be the boys'.'"

Carl R. Lange testified:

"One time I went to see him [Ata Worden] about some sacks, and Robert and I went in the house and talked with the old gentleman about the sacks. He said, 'Whatever Robert does is satisfactory to me,' . . . so whatever Robert did was a go; he was satisfied."

Thomas H. Edwards testified:

"I was township assessor in 1914, and went there [Worden's farm] to assess in March or April. I went there to assess Ata Worden, and of course asked for general information, and he said the place belonged to Bob, and referred me to Bob for the information I desired. I examined the improvements. Robert built a woodshed and a couple of wells, and built a barn, and built an addition to the barn and a wagon shed. He made these before Ata Worden died."

Mrs. Mae Houser testified:

"I knew Ata Worden and visited them the evening before Christmas [1913] . . . . He spoke of leaving his property to his two nephews Elmer and Robert. He said they would have a good home after he was gone, and I said, 'Do you intend leaving the property to the two boys Elmer and Robert?' and he said, 'Yes, providing they care for me as long as I live.' . . . I said that would be nice for the boys, and he said they were good boys and had been taking care of him, and if they took care of him as long as he lived the property would be theirs."

There was no rebuttal testimony as to the agreement between uncle and nephew for the passing of the south twenty

acres, nor of the testimony as to the making of the will in carrying out that agreement. The will itself is strong confirmatory proof that such an agreement was entered into. A case of this kind would not require the same degree of convincing evidence as those cases where no will had been made in conformity with an alleged oral contract. Here the will as actually made fully corroborates the other evidence. We think the trial court should have found that the oral contract to devise by will was entered into.

The case of *McDowell v. Lucas*, 97 Ill. 489, presents a case where an oral contract that a son should have certain lands on the death of the father was sustained upon evidence almost parallel to that in this case. The court said:

"Here was a payment of the purchase money by four or five years' labor, which the son rendered to the father after he was of age, followed by an actual possession of the premises and the making of lasting and valuable improvements thereon, under and in pursuance of a verbal contract to convey the title. The concurrence of these things when clearly established has always been regarded as sufficient to authorize a court of equity to decree a conveyance. *Bright v. Bright*, 41 Ill. 97; *Kurtz v. Hibner*, 55 id. 514; *Langston v. Bates*, 84 id. 524.

"The fact that William Lucas paid his father one-third of the crops each year raised on the land, and the latter paid the taxes, does not militate against his right to a decree. Had the payment of rent been unexplained, a different question would have arisen, but it appears, from the testimony, to have been a part of the contract, that one-third of the crops should go to the father during his life, and he was to pay the taxes, and at his death, the absolute title should vest in the son. The payment of rent, therefore, in this case, does not establish the relation of landlord and tenant between the parties and tend to prove that William Lucas was not occupying as a purchaser, but, on the other hand, the payment of rent was consistent with the contract under which William Lucas entered into possession of the land."

It has long been recognized as within the equity jurisdiction of courts to compel specific performance of a promise to

devise land given in consideration of a parol agreement which has been already proved and partly performed, since part performance would take the contract out of the statute of frauds. Waterman, Specific Performance of Contracts, § 41; *Gupton v. Gupton*, 47 Mo. 37; *Swash v. Sharpstein*, 14 Wash. 426, 44 Pac. 862, 32 L. R. A. 796.

While it is the rule in this state that the execution of a will is not sufficient in itself as part performance taking an oral contract out of the statute of frauds (*McClanahan v. McClanahan*, 77 Wash. 138, 137 Pac. 479, Ann. Cas. 1915A 461), still we think the will is admissible in evidence in support of other evidence tending to establish the contract. *Maddox v. Rowe*, 23 Ga. 431, 68 Am. Dec. 535; *Brinker v. Brinker*, 7 Pa. St. 53; *Moore v. Bryant*, 10 Tex. Civ. App. 131, 31 S. W. 223.

In *Maddox v. Rowe, supra*, a will executed by a father in carrying out an agreement with his son was void for want of the required number of witnesses. The court in that case said:

"The father made in writing, what he thought was his will, and in that writing, he said, that he gave the two lots of land in controversy, to the son. The contract, on his side was, that he should give these two lots to the son. Here, then, is a *writing* that may serve to help to prove the contract. The case is such, therefore, that it is not left wholly at the mercy of parol evidence. True, this writing was void, as a will, but that did not prevent it from being good to help prove the contract."

The case of *Hiatt v. Williams*, 72 Mo. 214, 37 Am. Rep. 438, is almost identical in its material facts with the case at issue here. The court there said:

"The object of this suit was to procure a specific performance of an agreement, after the death of the person with whom the agreement is alleged to have been made, upon the ground that the plaintiff had fully performed on his part. The plaintiff was the youngest son of Th. Hiatt, who had four children. In 1858, having provided for his other chil-

dren, as he supposed; to each of his two daughters having given a share, and his son who went to California, some money, he agreed with plaintiff, his youngest son, that if he would remain upon the homestead and support his father and step-mother during their lives, and work the farm (180 acres) under the direction of his father, he would convey in fee the homestead to the plaintiff, but not to take effect till he and his wife were dead. This arrangement was claimed and proved. In 1861, the father, with a view to carry out this purpose, which he was told could be best effected by a will, made a will devising this land to plaintiff. In the will, which was drawn up by defendant, Williams, who was a son-in-law of Hiatt, and a justice of the peace, no mention was made of his other children, and consequently, under our statute, it was a mere nullity. In 1866 this paper was delivered to plaintiff by his father, as answering the purposes of the two contracting parties. In 1870 the father died, and in 1873 the step-mother died, during which seventeen years the plaintiff lived on and worked the farm. These facts were stated in the petition and fully supported by the evidence. The circuit court, however, refused to enforce the contract, upon what ground and for what reasons does not appear. No brief has been filed on the part of the defendant in error, and we have been unable to conjecture upon what ground the decree dismissing this bill, was based. The case seems to be identical in principle with the case of *Sutton v. Hayden*, 62 Mo. 101, and *Gupton v. Gupton*, 47 Mo. 37, though much stronger in facts than either. The attempt to execute the contract by a will would surely not place the plaintiff in any worse condition than he was before. The will was merely introduced in evidence to support the contract, and it was certainly very strong evidence to show the intent of the father, who doubtless supposed that it would accomplish his purpose. A verbal agreement of this sort, in case of performance on one side, was enforced in the case of *Gupton v. Gupton*. That case is in effect identical with the present, though infinitely less persuasive in its facts, for here there was an actual service of seventeen years. The judgment of the circuit court will be reversed, and that court directed to enter a decree in conformity with this opinion."

It is held in *Gupton v. Gupton*, 47 Mo. 37, that the surrender of the possession of a farm to a person who takes care

of the owner under an agreement to devise it to him in consideration of such care, and the execution of a will to that effect, makes a valid contract. Likewise, it has been held that the taking possession and making improvements under an agreement for the devise of certain land in consideration of caring for the owner until his death, is an enforceable contract. *Watson v. Mahan,* 20 Ind. 223; *Mauck v. Melton,* 64 Ind. 414; *Bird v. Pope,* 73 Mich. 483, 41 N. W. 514.

In the case at bar, we have all the elements of part performance justifying the enforceability of an oral contract for the devise of lands. Robert Worden not only went into possession of the land, cleared and cultivated it and made permanent improvements, but he boarded and cared for an aged man suffering with disease, all under a direct promise that he should have the land at the old man's death. The failure of the will executed in conformity with the contract throws the title to the land to his heirs, the respondents, Earl Worden Chafee and Lloyd C. Worden, his wife, Nellie Worden, having no interest because of the prior property agreements between herself and the deceased. These heirs, who receive the land because of the failure of the will, merely hold as trustees of the trust impressed upon the realty by their ancestor. In a note to § 191 of Pomeroy on Specific Performance of Contracts, the author states:

"The relief is granted, not by ordering a will to be made, but by regarding the property in the hands of the heirs, devisees, assignees, or representatives of the deceased promisor, as impressed with a trust in favor of the plaintiff, and by compelling defendant, who must of course belong to some one of these classes of persons, to make such a disposition of the property as will carry out the intent of the agreement."

If Ata Worden, in his lifetime, had conveyed the land to his nephew in discharge of the contract, his heirs would have been bound thereby. The facts in this case show full performance of the oral contract on the part of the appellants and attempted full performance on the part of the decedent

by the execution of the will agreed upon, although such instrument proved to be void through failure to conform to statutory requirements. This impressed the land with a trust which his successors in interest are bound in equity to discharge. The law is well settled that the heirs can be compelled to specifically perform the contract of their ancestor to the extent of making a proper conveyance, and in the event of their failure, that the court has power to appoint a commissioner to make the conveyance. In *Dicken v. McKinley*, 163 Ill. 318, 45 N. E. 134, 54 Am. St. 471, it is said:

"The weight of authority is in favor of the position, that a man may make a valid agreement to dispose of his property in a particular way by will, and that such contract may be enforced in equity after his decease against his heirs, devisees or personal representatives; (22 Am. & Eng. Ency. of Law, p. 974, and cases cited in note 2; Schouler on Wills—2d ed.— Sec. 454; Waterman on Specific Per. of Contracts, Sec. 51; Fry on Specific Per.—3d ed.—Sec. 223; *Weingaertner v. Pabst*, 115 Ill. 412)."

In *Burdine v. Burdine's Ex'r*, 98 Va. 515, 36 S. E. 992, 81 Am. St. 741, it is said:

"Strictly speaking, an agreement to dispose of property by will cannot be specifically enforced. . . . Yet courts of equity can do what is equivalent to a specific performance of such an agreement, by compelling those upon whom the legal title has descended to convey or deliver the property in accordance with its terms, upon the ground that it is charged with a trust in the hands of the heir at law, devisee, personal representative, or purchaser, with notice of the agreement, as the case may be. 3 Parsons on Contracts, section 406 (6th ed.); *Hale v. Hale*, 90 Va. 728, 730."

We are satisfied that the findings of fact made by the court, as to the absence of an oral agreement to devise and as to the community interest in the land of respondent Nellie Worden, are contrary to the evidence.

The decree of the lower court will be reversed, and the cause remanded with instructions to order the respondents

Earl Worden Chafee and Lloyd C. Worden to convey to appellants, Robert Worden and Jennie Worden, the south twenty acres of the northeast quarter of the southwest quarter of section 15, township 39 north, range 2 east, W. M., and in the event of their failure, that a commissioner to make the conveyance be appointed by the court. The executor of the estate of Ata Worden will also be instructed to distribute the personal property of the decedent to the appellants herein in accordance with the terms of the will.

ELLIS, C. J., MOUNT, HOLCOMB, and PARKER, JJ., concur.