## Mussinon's Administrator v. Herrin.

(Decided Jan. 23, 1934.)

496

DICKSON, BRADLEY & BLANTON for appellant.
C. A. McMILLAN for appellee.

Opinion of the Court by Judge Ratliff—Reversing.

Annie D. Mussinon died testate a resident of Paris, Bourbon county, Ky., on the 30th day of November, 1931. By her last will and testament, which was duly probated in the Bourbon county court, she devised to Maude Herrin, appellee herein, a small house and lot in the city of Paris, Ky., which was of the approximate value of $750. The remainder of her property, after the payment of her debts, she devised to her two nephews.

In September, 1932, appellee instituted this suit in the Bourbon circuit court, and for her cause of action alleged, in substance, that in March, 1920, she (appellee) and Annie D. Mussinon, the decedent, entered into a verbal contract by the terms of which appellant was to live in the home with Mrs. Mussinon and take care of, and become a companion of, the decedent, and that, in consideration of such services, company, and companionship of appellee, in the event appellee should survive decedent, decedent would leave to appellee all her property after the payment of her just debts. It is further alleged that, pursuant to this verbal agreement, on March 25, 1920, decedent executed a certain writing in the form of a will which reads as follows:

"Knowing life is uncertain I write this for my last will & also knowing Mrs. Stearn didnt do as she promised I feel that I am at liberty to change the will Mrs. Stearn holds & to do with my property as I think best

"First

"I want my depts payed

"Second

"I leave five Hundred dollars to the one that will take good care of my late Husband Louis Mussinon pet dog if she is living at the time of my death. Maude Herrin is to take the dog

"third

"I devise & bequest all of my property Money Whatever I may Have at the time of my death to Maud Herrin of Paris Ky for her Love & Kindness to me. after the death of Husband Loui Mussinon

I bequest this to her because as she has made a Home for me & looked after me when I was sick

"I Request the Court not to Require of her any Bond.

"It is my Request that Five Hundred Dollars be put out on interest to keep up Lot in Paris Cemetery & to Buy Flowers for my husband Louis Mussinon grave. & I Request that the grave be— kept nice I also Request the papers in Hatrack of our Silver Anivsary be put in Casket with me.

"I ask some of my Friend to do that for me.

"Maud Herrin if she is Living
"Annie D. Mussinon."

The above writing was on the 21st of December, 1920, acknowledged by decedent before a notary public. It is alleged that decedent made this writing known to appellee as evidence of her good faith in carrying out the verbal contract. It is further alleged that, after the entering into the verbal contract and the making and exhibiting to appellee the writing above quoted, decedent executed her will of a later date, in 1924, by the terms of which she devised to appellee the said house and lot only and the remainder of her property to her nephews; this being the same will which was probated and the execution of which was unknown to appellee until after the death of decedent. It is also alleged that, pursuant to the contract and in compliance therewith, appellee lived in the home with decedent from March, 1920, up to the date of the death of decedent, which occurred on the 30th day of November, 1931, during which time appellee cooked the meals, cleaned the house, helped with the garden, bought the garden seed, provided the greater part of the groceries, and waited upon decedent both when she was sick and well, all of which services were rendered at the special instance and request of decedent and pursuant to the contract and agreement that appellee was to receive the balance of decedent's property after the payment of her debts. It is further alleged that the services so rendered by appellee to decedent were of the reasonable value of $10 a week, which services were rendered continually from the first week of March, 1920, and ending November 30, 1931 (the date of the death of decedent), aggregating 611 weeks, or a total sum of $6,110, subject to a credit of

$750, the alleged value of the property devised appellee. It is further alleged that appellee filed with appellant's administrator her properly verified claim of indebtedness of decedent's estate to her and same was rejected.

Appellant moved the court to strike from the petition certain allegations which motion was sustained in part and overruled in part. The court struck from the petition the writing purporting to be the will of decedent to appellee above quoted. If this writing has any place in the record, it would be that of evidence only, to which we will hereinafter refer. Under the well-known fundamental rules of pleading, evidence should not be pleaded. The court properly struck this writing from the petition. The court's ruling on other motions to strike are not, in our view, very material either way, because, if there was any error in his rulings thereon, same was cured by later pleadings and the evidence, and neither party was prejudiced thereby.

Appellant next entered a motion to require appellee to paragraph her petition, which motion was overruled, and this was followed by another motion to require appellee "to elect which of the several causes of action set forth in her petition she will prosecute in this action," which motion was also overruled.

It is our view that the petition as a whole only states a single cause of action, based on an expressed contract, on which theory the case was prosecuted to a conclusion, and the evidence adduced on behalf of appellee related to the expressed contract. This being true, the court properly overruled appellant's motions to paragraph and to elect.

Appellant filed its answer, in which it denied the material allegations of the petition, and in a separate paragraph pleaded affirmatively that, if appellee and decedent entered into the alleged contract, same was, by mutual agreement and understanding between the parties, abandoned and relinquished at or before the time of the execution of her will in 1924, which was subsequent to the alleged contract with appellee, and further that appellee had breached the terms of the alleged contract and had failed and refused to comply with the terms thereof or render the companionship or services demanded by the decedent, and that by reason of said breach the appellee is not entitled to recover on the alleged contract.

500

In paragraph III of the answer the five-year statute of limitations (Ky. Stats. sec. 2515) is pleaded and relied on as a bar to recovery, to which plea the court sustained a demurrer. The other parts of the answer made an issue of fact to be determined by the jury on the evidence. A reply was filed which consisted of traverse only.

The court properly sustained the demurrer to appellant's plea of limitations. It has often been held by this court that no cause of action accrues on a contract to care for or render services for a person during their life, before the death of the party to whom such services are to be rendered. Sturgeon's Adm'r v. McCorkle, 163 Ky. 8, 173 S. W. 149, and cases cited therein.

A trial on the issues thus formed by the pleadings resulted in a jury verdict and judgment in favor of the plaintiff in the sum of $6,110, less $750, the value of the real estate devised to plaintiff, and from that judgment this appeal is prosecuted.

Respecting the pleas that the contract was relinquished by the parties or that appellee breached the contract, there is no evidence conducing to sustain either plea.

Next it is insisted that the court erred in the admission and rejection of evidence to the prejudice of appellant. The first objection is directed to the admission in evidence of the above-quoted writing of decedent purportnig to be her will to appellee, but which was revoked by her subsequent will of 1924, under which her property (except the small house and lot) passed to decedent's nephews, which later will constituted the alleged breach of decedent's contract with appellee. The objection of the admission of this writing as evidence is based upon section 4852 of the Kentucky Statutes, reading as follows:

"No will shall be received in evidence until it has been allowed and admitted to record by a county court; and its probate before such court shall be conclusive."

Appellant cites and quotes from the opinion in the case of Skinner v. Rasche, 165 Ky. 108, 176 S. W. 942, 945, as follows:

"It is true that a void will which has been denied

probate may not be received as evidence *for any purpose.* Section 4852, Kentucky Statutes." (Italics ours.)

It will be noticed that the statute, supra, does not use the words *"for any purpose."* It is our view that the statute only prohibits the use of an unprobated will as evidence of title for the purpose of passing or otherwise affecting title to property or otherwise used in the technical sense of a will. But we do not think it is the purpose of the Statutes to prohibit the use of a will as evidence under certain circumstances, which was not void ab initio, but merely rendered inoperative by the execution of a subsequent will. It has always been the rule to consider a former will which has been revoked by subsequent will, for the purpose of showing a fixed intention of the testator. Major et al. v. Garrott et al., 157 Ky. 468, 163 S. W. 463. It follows then, by analogy of reason, that a will which has been revoked by a subsequent will may be considered as evidence tending to establish a contract of a decedent. In the instant case, the revoked will was not offered as a will or contract for the purpose of affecting title to the property, but was offered only as a part of the chain of circumstances in the evidence to prove the oral contract. It is alleged in the petition that decedent made her former will known to appellee as evidence of her good faith in carrying out the verbal contract. This was, of course, an inducement for appellee to carry out her part of the contract.

In the case of Montgomery's Adm'r v. Miller, 4 B. Mon. (43 Ky.) 470, it is said:

"A written clause or verbal declaration importing the acknowledgment of a debt, and making provision for its payment, in the form of a bequest, though never admitted to record as a will, may be evidence of a legal obligation, not only against the representatives of the party making such acknowledgment, but even against the party himself, in an attempt to enforce the obligation before his death."

See, also, to the same effect, Thomas, etc., v. Arthur, 7 Bush (70 Ky.) 245; Datillo Fruit Co. v. L. & N. Ry. Co., 238 Ky. 322, 37 S. W. (2d) 856; 22 C. J. 860.

In the case of Maddox v. Rowe, 23 Ga. 431, 68 Am. Dec. 535, it was held that a writing, though void as a

certain kind of contract, is nevertheless good to help to prove a contract. The court said:

"True, this writing was void, as a will, but that did not prevent it from being good, to help to prove the contract."

Under the facts and circumstances disclosed by the record, in light of the authorities above cited, it is our conclusion that the trial court properly admitted the revoked will in question as evidence for the purpose it was admitted. Bean's Adm'r v. Bean, 216 Ky. 95, 287 S. W. 239.

It is shown by the evidence that the decedent was a widow and lived alone, but did not like to stay in her home alone, and wanted some one to stay with her. Mrs. Farris, sister of appellee, testified in part as follows:

"8. What was the condition of Mrs. Mussinon after the death of her husband as to being able to live by herself or needing someone with her? A. Well, she never wanted to be alone; she wanted somebody with her; she didn't like to stay in her home alone.

"9. Do you know anything about an arrangement made between Mrs. Mussinon and your sister? A. Yes.

"10. About when was that arrangement made? A. I believe in March, 1920.

"11. Did you get this information from Mrs. Mussinon or from your sister? A. I got the information from both; from Mrs. Mussinon repeatedly, what she would do for my sister if she would come up there and help make a home for her and stay up there and help take care of her; more repeatedly from Mrs. Mussinon than I did from my sister.

"12. About when was the first time you got this information from Mrs. Mussinon, the first time? A. Well, I don't really remember just when it was. I haven't any dates; I didn't make any dates of what Mrs. Mussinon told me, but I do know that she told my sister that if she would come up there and help make a home for her—she could not make it by herself—She didn't have enough income to

pay her insurance, taxes and live; and if my sister would come and live with her and help make a home for her, if she outlived her, she would give her everything she had.

"13. Now, Mrs. Farris, was that arrangement entered into between your sister and Mrs. Mussinon? A. Mrs. Mussinon told me she had that in writing. She told me she went before a notary public and had it sworn to; that I need never be anxious about my sister for anything she done for her she would be well paid for it when she died.

"14. Now, Mrs. Farris, were you familiar with the services rendered by your sister to Mrs. Mussinon during the first year of this agreement? A. Yes, I was.

"15. Your mother was living at that time, I believe? A. Yes, sir.

"16. Now, what services did your sister render Mrs. Mussinon during the first year of this agreement? A. Mrs. Mussinon spent more of her time in my sister's home, before my mother died, than my sister spent in Mrs. Mussinon's home. I do know when she was sick and had nobody else to do anything for her, my sister would cook her meals and take them to her. She would do anything for her that Mrs. Mussinon wanted her to do."

A number of other witnesses gave testimony similar to that of Mrs. Farris. We note the testimony of Mrs. Norton as follows:

"9. Did she tell you anything about how she expected to repay Maude? A. I said to her one time,—I was admiring a beautiful vase, or bowl rather, in the dining room, I said to her, 'It is unfortunate, Mrs. Mussinon, that you never had a child to enjoy all these beautiful things.' She said, 'I have Maude.' She said, 'I have made a will and left everything to Maude.'"

As relating to the services appellee performed for decedent, Mrs. Dundon testified in part as follows:

"Counsel for Plaintiff: I asked you what work or labor you saw Miss Herrin perform.

"I would see a light over there between four

and five o'clock in the morning and I asked Mrs. Mussinon why they got up so early and she just told me that they had to get up early, Miss Maude did, so that she could get her work done before she went to work. I asked her what she did. She said she got breakfast and got dinner ready before she went to work.

"I have seen her nailing fences up and raking the yard, cutting the yard; I have seen her feeding the chickens; seen her wash windows; in fact, I have seen her do anything that any household woman would do.

"13. What did Mrs. Mussinon do? A. She usually stood around and superintended. I never saw her do anything. * * *

"15. With reference to paying the bills, did she tell you anything about how they were paid? A. Well, she told me that Miss Maude got everything, provided everything. She had a house shingled on the place and I asked her what it cost her and she said well, she didn't know, that Miss Maude paid for it. I have seen her come home night after night, until she got her machine, with a basket. Mrs. Mussinon has come to my house and used my telephone to get Miss Maude to get certain things for the table more than once. * * *

"17. Did Mrs. Mussinon tell you anything about Maude paying the hired help? A. Yes, she told me that Maude paid Jim, the old negro man.

"18. It was Mrs. Mussinon that told you that? A. Both of them, Mrs. Mussinon and Jim.

"19. Now, Mrs. Dundon, did Mrs. Mussinon tell you any arrangements that she had with Maude about how she was to be paid? A. Well, she told me that Miss Maude provided everything.

"20. Did she tell you anything about how she was to repay Miss Maude for providing it? A. Well, she told me that she was going to give Miss Maude everything she had."

A number of other witnesses who testified to the services rendered by appellee and statements of decedent corroborated the above witnesses. Without mak-

ing further detailed reference to the testimony, it is sufficient to say that there is an abundance of testimony tending to show that appellee was a faithful servant and companion of decedent. It is in evidence that certain repairs and improvements were made to the house of decedent in which she and appellee lived. The evidence is not clear as to which, appellee or decedent, paid for the repairs and improvements. It is shown by the carpenters who did the work that they made the contract with, and received their pay from, decedent. But it is not shown whether decedent paid these bills with her own money or whether appellee furnished her the money to pay same. The record does not disclose that decedent had any income of any note, but it is shown that appellee was employed at a shoe store and received $900 or $1,000 per year salary. It is shown that decedent made statements to various neighbors, about the time that appellee went to live with her and during that time, that she (decedent) did not have money to pay her taxes and other living expenses. It is insisted that the court erred in the admission of evidence relating to the value of the services of appellee, in that certain witnesses were asked to state the value of these services, and they would preface their answer by saying, "I hardly know," and other expressions of similar meaning, but finally gave their opinion as to the value of the services. This was not a subject on which expert testimony was required or necessary, and the fact that the witnesses did not technically qualify is not material. The value of such services rendered by appellee is a matter of common knowledge, and the jury, no doubt, were as able to place a value on these services as the witnesses were. We do not deem this testimony prejudicial to the substantial rights of appellant. The evidence adduced in behalf of appellant to some extent contradicted the evidence for appellee on some points, but the principal part of the material evidence for appellee is uncontradicted. On the whole, the evidence is amply sufficient to sustain the verdict.

The next complaint is directed to the instructions. The instruction complained of is as follows:

"No. 1. If the jury believe, from the evidence in this case, that Annie D. Mussinon made an agreement with the plaintiff, Maude Herrin, that if the plaintiff would take care of and become a companion of Annie D. Mussinon, with the further

understanding between the said Annie D. Mussinon and the plaintiff that at the death of the said Annie D. Mussinon, the plaintiff was to receive the balance of said Annie D. Mussinon's property; and if the jury further believe that the plaintiff did render such services, then you will find for the plaintiff such sum as you may believe from the evidence the services were worth,—not exceeding, however, $10.00 a week for 611 weeks, or a total of $6,110.00, the amount prayed for in plaintiff's petition.

"Unless you so believe, you will find for defendant."

It is insisted that the instruction above quoted allowed the jury to find for the plaintiff upon either an expressed or implied contract, and did not require the jury to believe that there was an expressed contract. Instead of using the word "contract," the court used the words "agreement" and "understanding." The words "agreement," "understanding," and "contract" are commonly use interchangeably or synonymously. An agreement or understanding between parties respecting their rights in a business transaction constitutes a contract. It is inconceivable that the jury could have been misled by the use of the words "agreement" and "understanding" instead of the word "contract," or that appellant's rights were thereby prejudiced.

The further point is made that the verdict is excessive. But it will be remembered that the services rendered by appellee were not the sole purpose of the contract or desire of deecdent to have appellee to live with her. It appears that the chief purpose on part of decedent was the company, companionship, and protection of having some one to live in the home with her. Moreover, the evidence was sufficient to warrant the jury to believe, and perhaps it did believe, that appellee expended quite a sum of her own money in the maintenance and support of the home and of which decedent was a beneficiary. Taking into consideration all' these elements, in all the circumstances, we are unable to say that the sum found by the jury is excessive.

The further complaint is made that the judgment allows appellee interest from December 14, 1931, instead of from date of judgment. The court entered judgment bearing interest from the date of judgment. Later appellee entered motion to correct the judgment

so as to bear interest from December 14, 1931, which motion was sustained and the former judgment set aside or modified so as to allow interest from December 14, 1931. Under the pleadings and the evidence, the appellee was not entitled to interest except from the date of the rendition of the judgment; the amount not being liquidated until the verdict of the jury. The so allowing of the interest was not a clerical misprision. Colovas v. Allen Motor Company, 242 Ky. 93, 45 S. W. (2d) 809. It was an error of the court entitling the appellant to a reversal.

The judgment is reversed, with directions to enter judgment allowing interest from the date of judgment on the sum of $5,360. The appellants will pay three-fourths of the cost of this appeal and the appellee one-fourth.

The whole court sitting.