MARJORIE DAVIDGE MANNIX *v*. ROBERTA V. BAUMGARDNER

[No. 35, January Term, 1945.]

*Decided April 12, 1945.*

The cause was argued before MARBURY, C. J., COLLINS, GRASON, MELVIN, HENDERSON and MARKELL, JJ.

*Parsons Newman* and *Richard E. Zimmerman* for the appellant.

*Edward J. Smith* and *Benjamin B. Rosenstock* for the appellee.

HENDERSON, J., delivered the opinion of the Court.

Marjorie Davidge Mannix, individually and as executrix of the last will and testament of Robert Harold Davidge, deceased, appeals to this court from a decree of the Circuit Court for Frederick County, in Equity, holding that a valid and enforceable contract was entered into by the deceased and the appellee whereby the deceased agreed to devise to the appellee the real estate of which he died seized and possessed. The decree appointed trustees to make the conveyance.

Robert Harold Davidge, the deceased, was a travelling typewriter repairman who came to Frederick about 1909 and made the acquaintance of Mrs. Georgia C. Kennedy, through eating at her restaurant known as the "Gem Lunchroom," and occupying a room over the restaurant. Her husband, Jeremiah Kennedy, a tailor, died September 17, 1909. Mrs. Kennedy and Davidge were married July 1, 1910. She owned a number of rental properties, which she had acquired from the profits of the restaurant business, and by inheritance. Davidge appears to have had no property except the tools of his trade; even at that time he was addicted to gambling and playing the races, a chronic alcoholic of the periodic type, and according to one witness, a drug addict.

The appellee, daughter of Mrs. Kennedy, at this time was a girl eight years of age and while the Davidges were travelling over a circuit on which Mr. Davidge cleaned and repaired typewriters in various towns and cities, the appellee was boarded in the Visitation Convent. Mrs. Davidge, under the tutelage of her husband, became adept in assembling and cleaning typewriters. When the Davidges were in Frederick they rented furnished rooms.

On January 15, 1921, the appellee married Bernard R. Baumgardner and the young couple made their home with his parents on North Market Street, where they

had a room of their own, were treated as members of the family, and paid no board or lodging.

On January 29, 1920, Mr. and Mrs. Davidge had conveyed all the property she then owned, except the five Bentz Street properties and two on Carroll Street, which had been placed in their names as tenants by the entireties in 1910, to a straw man, who reconveyed to the Davidges for life, with remainder to the appellee. On April 1, 1921, Mr. and Mrs. Davidge purchased the property 149 West Patrick Street as a home and place of business.

Mrs. Davidge died in April, 1923. In September, 1923, Mrs. Joseph Price, who had been a tenant of the Davidges, occupying a second floor apartment at 149 West Patrick Street, after giving a month's notice, vacated the premises because of Davidge's drinking and the type of associates he brought into the house.

Bernard R. Baumgardner, the husband of the appellee, testified that about the middle of August, 1923, Davidge called to see his wife, and told the appellee in his presence that if she would move to Patrick Street and make him a home he would in turn see that she got the entire estate which was his at his death. Davidge was then about 50 years of age, and his drinking and gambling propensities were notorious. There were at least three or four conversations along this line. According to the witness, Davidge specified that she should pay $20 a month rent, take care of him and render such service as necessary when he was intoxicated, board and lodge him, and do his washing and mending in return for his promise. The appellee finally agreed, and she and her husband, with their two small children, moved to 149 West Patrick Street in October, 1923, and remained there until the death of Mr. Davidge in June, 1940.

About six years after the alleged agreement between Davidge and his stepdaughter, he took her to the office of his attorney and executed a will in her favor, dated June 20, 1929, and delivered it to her for safe keeping. However, in October, 1929, he executed another will in

favor of his sister, Mrs. Marjorie Davidge Mannix, without the knowledge of the appellee. From the death of his wife in 1923, Davidge acquired six properties in Middle Alley, a property on West Street and a house on West South Street. His income from the properties acquired from his wife averaged. $200 a month throughout the period.

During the period from October, 1923, until his death in 1940, Davidge accepted from the appellee. the monthly rent, his board, washing and mending, most of his clothing, care and ministration during his sprees, which became progressively worse, as well as assistance in his shop by the appellee and her children. Yet there is not the slightest suggestion in the record that the appellee received from Davidge any remuneration whatever for these services.

The appellant's chief contention is that Davidge did not enter into any contract with the appellee, or if he did, that the contract is unenforcible under the Statute of Frauds, or for vagueness and uncertainty. She also contends that the first will was revoked by the second, and that it was error for the court to admit the first will in evidence.

The legal principles involved are well established. When services of a unique and substantial character have been fully performed by a promisee, this is enough to take the case out of the Statute of Frauds, if an oral contract to convey is affirmatively established by clear and convincing evidence. Under such circumstances, and where it is impossible to restore the parties to their original position, equity has jurisdiction to prevent an injury amounting to a fraud. Specific performance is effected by means of a constructive trust. *Weaver v. King*, 184 Md. 283, 40 A. 2d 511; *Evans v. Buchanan*, 183 Md. 463, 38 A. 2d 81; *Fitzpatrick v. Michael*, 177 Md. 248, 9 A. 2d 639; *Neal v. Hamilton*, 159 Md. 447, 150 A. 867; *Scott v. Marden*, 153 Md. 1, 137 A. 518; *Semmes v. Worthington*, 38 Md. 298. 2 *Williston, Contracts* (Rev. Ed.), Sec. 494.

Whether the execution of the first will would alone suffice to take the case out of the Statute of Frauds is a question upon which we need not pass. Compare *Lorenzo v. Ottaviano*, 167 Md. 138, 167, 173 A. 17, 179 A. 536.

In the case at bar there is direct testimony by Mr. Baumgardner that a contract was made, and this is corroborated by a number of circumstances. The fact that the appellee paid rent to Davidge is an indication that the parties were entering into a business relationship, and not dealing solely in terms of love and affection. Moreover, there is the direct testimony of Mrs. Hemp, who had collected rents for Mrs. Davidge, that in September, 1923 Mr. Davidge told her that the appellee, whom he called "daughter," was holding out and everything would be taken care of when she came home," that "daughter was holding out and it was not very desirable after Mrs. Price moved out." This admission was made before the appellee moved to 149 West Patrick Street, which had never been her home, and strongly supports an inference that the appellee was unwilling to move unless there was a definite understanding. There is also evidence that the appellee kept insisting that Davidge make a will in her favor. William B. Davidge testified that the deceased told him, in September, 1929: "I let Roberta badger me into making out a will for her; she annoyed and pestered me for a long time previous to that." In a letter to his sister dated May 5, 1932, Davidge wrote: "The only reason I drew a will before my last will leaving everything to my daughter—was to keep her from always asking me to deed my home over to her and other propities." Such insistence permits the inference that the appellee was demanding performance of a prior contract, and after the will was drawn and delivered to the appellee, Davidge took care to inform her husband and her mother-in-law, that he had "fixed daughter and the children and that he had made his will," and that "we have just been up to Mr. Brown's office and I have given daughter everything; everything goes to daughter and the children."

Davidge made many similar statements to other persons, some in the presence of the appellee, that "everything goes to daughter and the children"; "it is all hers when I die." The most striking of these statements was made a few days before his death, when he had received the last rites from the priest; he told the witness Seeger that he had made a will leaving everything to "daughter" and that she had a copy of it.

It is true that throughout the entire period Davidge was writing, or telling his sister upon her infrequent visits to Frederick, that she would be his heir, and that he sent a copy of the second will to her in 1932. His contradictory statements cannot be reconciled, and justify the conclusion that, with characteristic faith in his own cleverness, he sought to deceive and mislead both his stepdaughter and his sister.

The only benefit, financial or otherwise, that the appellee stood to gain by moving to her step-father's home was the prospect of receiving his estate. She left her father-in-law's home, where she was happy and contented, and where she paid nothing for her board or lodging. There is no evidence of any friction between her and her mother-in-law, and her husband was in business with his father. According to the stipulation of the parties, the properties that Davidge left, although improved by 16 houses, are assessed at a total of only $14,610. Throughout a period of seventeen years, during 11 of which she had the first will in her possession, she prepared and served his meals, washed and mended his clothes, treated him as a member of the family, made excuses for him to his customers, searched for him in unattractive places where he lay drunk, and performed the most menial services when he was unable to wash or care for himself, and there is medical testimony that the appellee's health was seriously affected by her undertaking. To permit the second will to prevail in such circumstances would work a fraud upon the legitimate rights and expectations of the appellee. *Soehnlein v Pumphrey,* 183 Md. 334, 37 A. 2d 843; 3 *Bogert, Trusts and Trustees,* Sec. 480, p. 1501.

We find nothing in the alleged contract that would render it unenforcible for uncertainty. It is true that . the first will left some trifling cash bequests to the testator's sister and her children. But these are not necessarily inconsistent with his original undertaking, which had reference primarily to the dwelling and rental properties constituting his estate, and if the appellee was informed as to these bequests, her consent to them might be inferred. In any event, the decree does not invalidate the second will, but merely declares a trust in the real estate. *Scott v. Marden, supra.*

We find no error in the ruling of the Court below in admitting the first will in evidence. It was not admitted as a testamentary document; as such it was revoked by the later will. But it was properly admitted as a part of the chain of circumstances tending to support the existence of a prior verbal contract to make a devise by will. In *Wilks v. Burns,* 60 Md. 64, 70, this court said:

"There can be no doubt of the legal right of one, having the exclusive ownership of property, to enter into a contract to execute a will in favor of the other contracting party; but such transaction cannot be properly termed a testamentary disposition of property; two or more contracting parties having concurred and bound themselves by reciprocal obligations, founded on good and valuable considerations. The testamentary document is nothing more than a part of the contract, which has been determined by mutual stipulations, controlling the mind of the testator.

"If a will executed under these circumstances is subsequently cancelled, the aid of a Court of equity can be invoked. * * * If the proof is sufficient, the Court decrees a specific performance of the contract; the will being examined merely to ascertain the terms of such contract, of which it has become a part."

The execution of the will was a fact of a corroboratory character bearing upon the question of the existence of the contract, though not sufficient, standing alone, to establish it, for it contained no reference to a prior agree-

608

ment, and was in its nature ambulatory. *Marden v. Scott,* 154 Md. 414, 420, 141 A. 348; *Burgess v. Burgess,* 109 Pa. 312, 1 A. 167; *Worden v. Worden,* 96 Wash. 592, 165 P. 501; *Mussinon's Adm'r v. Herrin,* 252 Ky. 495, 67 S.. W. 2d 710. See also notes, 69 A. L. R. 14, 202; 106 A. L. R. 743, 765; 4 *Page on Wills,* Lifetime Ed., Secs. 1752, 1753, and cases there cited.

We agree with the finding of the Court below that a valid and enforcible contract was established.

*Decree affirmed with costs to the appellee.*