## WHITNEY v. DEWEY.

(Circuit Court of Appeals, Ninth Circuit. December 2, 1907.)

No. 1,416.

**1. PARTNERSHIP—CONTRACT CREATING—CONSTRUCTION.**

Complainant, having initiated water rights in a stream believed to be valuable, entered into a written contract with another who, as a promoter, undertook to obtain capital to construct a dam and develop a water power. Each was to devote his best efforts to securing funds, and each was to own one-half interest in the property, with a proviso that in case the second party did not make satisfactory progress within a year he should retire from the enterprise, and assign all of his rights and interest to complainant. *Held*, that the contract was one of partnership, and any property acquired by either, in furtherance of the joint enterprise so long as it continued, was held in trust for the joint benefit of both.

**2. SAME—RELATIONS OF PARTNERS—DUTY OF GOOD FAITH.**

The first and highest duty which partners owe to each other is perfect good faith; each is under obligation to do what he can to promote the success of the partnership, and in every purchase or bargain each is under a duty to use the property of the concern for the benefit of all.

**3. SAME—REAL ESTATE ACQUIRED BY PARTNER—TRUST.**

Equity will apply its broad principles to secure all partners their rights in real estate which equitably belongs to the firm by regarding the legal title if in one partner as held on an implied trust for partnership purposes.

**4. SAME—RIGHTS OF PURCHASER FROM PARTNER.**

One who, knowing that real estate is the property of a partnership, pays for and takes title to it from one partner alone, without the knowledge or consent of the other, takes the title that he gets at his peril and on the responsibiliy of the person with whom he deals.

**5. SPECIFIC PERFORMANCE OF PARTNERSHIP CONTRACT—PURCHASER WITH NOTICE.**

Complainant and another formed a partnership, the purpose of which was to form a corporation to develop a water power, the right to which complainant owned. The contract provided that each should own a half interest in the property, but that, if the second party should not succeed in obtaining capital within a year, complainant might at his option dissolve the partnership, and should receive from his partner an assignment of all his rights and interest in the property. It being thought necessary to acquire certain land for a dam site, the partner obtained a warranty deed therefor from the owner to himself, agreeing to pay for the same when the corporation was organized. He afterward, without complainant's knowledge, acquired a half interest in the grantor's equitable title. Some time after the expiration of the year, nothing further having been done, complainant dissolved the partnership, and demanded a transfer of his partner's interest, but the latter claimed that so far as the dam site was concerned he took the deed which had not been recorded in trust, and that it never became operative because the project was not carried through. In such belief complainant bought the land from the grantor in such deed, taking a quitclaim, which he recorded, and entered into possession. Subsequently his partner sold and conveyed a half interest in the property to another, who sold to defendant, both of whom had knowledge of the partnership and of complainant's claim and possession. *Held*, that the original deed conveyed the full legal title for the benefit of the partnership, and that on the dissolution complainant became entitled under the partnership contract to a conveyance to himself, and that he could enforce such right by suit for specific performance against defendant who took subject thereto.

158 F.—25

6. SAME—NATURE OF SUIT.

    Such a suit was not one for a forfeiture of rights on the termination of the partnership agreement, but to enforce a specific performance of its terms.

7 FORFEITURES—DEFINED.

    "Forfeiture" usually signifies loss of property by way of compensation for injury to the person to whom the property is forfeited, as well as punishment.

Appeal from the Circuit Court of the United States for the Central Division of the District of Idaho.

Gavin McNab and Richards & Haga, for appellant.

W. E. Borah, for appellee.

Before GILBERT, Circuit Judge, and DE HAVEN and HUNT, District Judges.

HUNT, District Judge. W. Grant Whitney, a citizen of Oregon, appellant, brought this suit against E. H. Dewey, a citizen of Idaho, appellee, praying for a decree requiring Dewey to assign, quitclaim, and set over to appellant all his (defendant's) right, title, and interest in and to certain real estate in the counties of Boise and Canyon, Idaho, as provided in an agreement dated September 7, 1899, between complainant and one Willard White, and for such other relief as is proper. Among the defenses set up by Dewey is the statute of limitations; that an action was begun and tried in a state court of Idaho, wherein Whitney, appellant here, was the plaintiff, and Dewey, appellee here, was the defendant, and that a judgment of the Supreme Court of the state of Idaho in the said suit has become final, and that Whitney is now estopped, by reason of said suit and judgment, from litigating any of the questions involved in this suit; that on January 25, 1900, one Beery and wife were the sole owners and seised in fee of the property involved, and that they conveyed the property by warranty deed to White, and at the time of the conveyance, no one else had any interest in the undivided half interest in said property now claimed by Dewey; that the conveyance of warranty to White was made with the full knowledge of Whitney, and that thereafter White conveyed to Cobban and Casey, who retained possession until sale to Dewey; and that Dewey, for a valuable consideration, became the owner of an undivided half interest in the property; and that, when the conveyances to Cobban and Casey and Dewey were made, none of said parties had knowledge of any claim or equity of Whitney or any one else; and that there never was any combination and confederacy, as charged in the bill. There was a trial and decree dismissing complainant's bill. Complainant appeals.

The essential facts are as follows: Complainant, prior to September 7, 1899, had located a water right on the Payette river in Idaho, whereby he appropriated a quantity of water for power and irrigation purposes, and had commenced proceedings to secure title to a right of way for a reservoir site in connection with his water appropriation. Complainant then met one Willard White, whom he heard was representing capital and could be of service to him. The two looked over the ground. In order to utilize a reservoir site, it was necessary to ac-

quire certain land on which was situated a good dam site, the general purpose in view being the utilization of water for generating power. With a view to raising funds wherewith to carry out their plans, complainant and Willard White, upon September 7, 1899, entered into the following contract:

"This agreement witnesseth: Whereas, W. G. Whitney and Willard White having acquired a dam, a log storage and power site on the Payette river, at a point called the Black Rock Canyon about six miles above the town of Emmett in Canyon county, Idaho; and

"Whereas, it is proposed to secure sufficient funds with which to erect a dam at said site, about 30 feet in height, with a view of creating a large water power to be used in sawing lumber, elevating water upon both sides of the Payette river for the purpose of irrigation, and for generating electric power to be utilized for railway and such other purposes as may be found feasible.

"Now, therefore, in consideration of the premises, each of the parties hereto agrees to give his best efforts to the immediate accomplishment of the above-mentioned project, and does agree that the parties hereto are to own an equal interest in such undertaking, share and share alike.

"It is further agreed that in the event the said White shall fail to raise sufficient funds to construct said dam or fail to make such progress as shall be satisfactory to said Whitney within one year from the date hereof, the said White agrees to assign all his right, title, and interest in the same to said Whitney.

"Witness our hands and seals this 7th day of September, 1899.
                                            "W. Grant Whitney,
                                            "Willard White."

After making this agreement, the parties, believing that it was necessary to secure title to the land involved in this suit, concluded to acquire the same from the owner, I. R. Beery, of Minneapolis, Minn. White, by agreement, was to obtain a contract from Beery for the purchase of the land. About December 26, 1899, White went to Minneapolis, and obtained a contract for purchase from Beery. This contract was between Beery and White. By its terms, in consideration of the covenants named in the contract to be performed by White, Beery agreed to sell, and White agreed to buy, the property now involved in this litigation. White agreed to pay to Beery $6,000—$1,000 in cash was to be paid on or before February 1, 1900; and $5,000 in first mortgage bonds in a corporation to be formed for the purpose of developing a power plant at the site of the reservoir and dam, the bonds to be issued upon the property described, and improvements to be placed thereon. The contract also provided that in the event of a failure to comply with the terms thereof by White, Beery was to be relieved from all obligation to convey the property, and White should forfeit all right thereto at the option of Beery. It also provided that, upon payment in the time and manner specified, Beery was to execute to White and his assigns a sufficient deed conveying to White the title to the property. No money was paid to Beery under the terms of the contract. White then went to New York and other places to try and secure money to carry out the plans of himself and Whitney, and on his way back to Idaho, about January 25, 1900, again saw Beery, and obtained from him a warranty deed to the property. No money was paid to Beery for this deed. When White returned to Idaho, he told Whitney that he had talked with Beery about forming the company,

and that Beery had suggested to him that he make him the deed, and that White should take it to be used when the conditions of the contract of December 26, 1899, were complied with. White also told Whitney that he took the deed to avoid any delays and as a matter of trust, and that, when the company would be formed and the conditions of the contract complied with, "the deed should be turned to the company, but should be used for no other purpose." Beery never was paid any money, but did not declare forfeiture, as he was authorized to do under the provisions of the contract. White failed to raise the money to carry out the scheme of a corporation, and when September 7, 1900, came about, practically nothing had been effected by White toward obtaining money to build the dam. Whitney, however, did not notify White at that time that progress was not satisfactory to him, and, as White said he could succeed if allowed to go ahead, matters were permitted to run along for about seven months thereafter, or until April 1, 1901. During all this time Whitney advanced considerable money, though it had been agreed that White was to pay his own expenses. No company had been organized prior to April 1, 1900. No money had been obtained, and Whitney says he could not see that White had any prospects or definite plans ahead. Thereupon, about April 1, 1901, Whitney told White that what had been done was not satisfactory, that he could see no future to it, and that negotiations between himself and White, under the contract of September 7, 1899, must be at an end, and asked White to assign to him any interest he had under the contract. White told Whitney that he could not assign to him the deed which Beery had made to him because the property did not belong to him, but had been taken from Beery as a trust to enable matters of closing up the proposed company to be expedited, but that he (White) had no right to transfer it; that the deed was subject only to the conditions of the contract, and that, as there had been no money paid for the deed, if the contract could not be carried out, the deed would be of no validity, and that he could not transfer it for that reason. From April 1, 1901, Whitney and White never have had any personal dealings with each other, although there was some negotiation through counsel for a payment by Whitney to White, by way of compromise for any possible claim or interest White might have. After Whitney and White dissolved their relationship, Whitney, still believing that the warranty deed of January 25, 1900, was invalid, negotiated directly with Beery for the purchase of the land involved, and on May 13, 1901, Beery, by quitclaim deed, conveyed the land to Whitney in consideration of $1,000 cash paid to him by Whitney. This quitclaim deed was recorded in the proper offices in Idaho about May 21, 1901. Whitney made some improvements upon the property very soon after receiving the deed. Thereafter, about August 7, 1901, White, in consideration of $1,800, gave a quitclaim deed to the firm of Cobban & Casey for an undivided half interest in the land herein involved. Prior to that date, about May 22d, Whitney met R. M. Cobban, of the firm of Cobban & Casey, and told him that he and White had dissolved, told him of the contract of September 7, 1899, between himself and White, and that White no longer had an interest in the

property, but that complainant and one Davis had control. Thereafter, on September 27, 1902, Cobban & Casey, in consideration of about $2,000, quitclaimed to the appellee Dewey whatever interest they had in the land in question, by reason of their deed from White. Before they quitclaimed they explained to Dewey that Whitney had a quitclaim deed from Beery, and appellee had actual knowledge also that Whitney claimed to be the owner of the whole property. The case becomes somewhat complicated by a contract dated April 25, 1900, between Beery of Minneapolis and White. In this contract, it was recited that whereas Beery was the equitable owner of the property, and Willard White held the legal title by virtue of a deed which had been executed by Beery and wife under an agreement theretofore entered into between Beery and White, and whereas it was desired by the parties to enter into a new and different agreement in relation to the property, therefore it was agreed that White had, upon the day of this last referred to deed (April 25, 1900), become the owner absolute of the equitable, as well as of the legal, title to a half interest, undivided, in the property, for the consideration of $750, $150 of which was paid the day of the date of the deed, $100 was to be paid May 15, 1900, and $500, was to be paid by January 1, 1901. Beery also bound himself to convey to White the remaining half interest upon payment of $1,750 on or before January 1, 1901. This contract between Beery and White also recited that it was the aim and intention of the parties to utilize the premises for the construction of a dam to raise water for irrigation, and for the development of water and electrical power; and that, therefore, in the event that the parties to the agreement should thereafter agree to promote such enterprise for the construction of the dam and the development of power, White, as a partner with Beery in the promotion of the enterprise, was to be given a credit of $2,500 at the time of the institution of the partnership, for time and money already expended in the promotion of such object, and in defending the title, and that if the partnership was formed and the promotion was proceeded with the option was to be withdrawn and annulled, and the parties were to proceed as partners in the promotion of the objects named. It will be observed that this contract was made during the first year of the existence of the contract between Whitney and White, dated September 7, 1899. It was made secretly, never was recorded, and Whitney testified that he never knew of its existence before the trial of the suit in the state court hereinafter referred to.

On July 22, 1903, Whitney commenced an action against Dewey in the state courts of Idaho, praying for a decree quieting his title to the property herein involved, and for an injunction against Dewey from asserting any claim to the premises. Dewey denied Whitney's right and title, and set up title in himself to an undivided half interest in the premises, claiming through the warranty deed of January 25, 1900, to White, and the deed from White to Cobban & Casey. On appeal the Supreme Court of the state discussed the contract of September 7, 1899, hereinbefore set out in full, referred to the agreement of December 26, 1899, between Beery and White, to the deed made

by Beery and wife to White on January 25, 1900, and to the agreement between Beery and White of April 25, 1900. It was decided that the warranty deed to White was delivered, and that Beery, as a grantor, could not, by his warranty deed absolute on its face, convey such a title to his grantee, White, as would enable White to pass a good and perfect title, and at the same time attach such parol conditions to the deed upon its delivery as to preclude White from conveying and transferring an equally good title to any other person. It was held that, under the deed of January 25, 1900, the entire legal title passed from Beery to White, and that evidence offered for the purpose of showing a failure to vest title in White under the warranty deed was improperly admitted. It was also held that by the contract of April 25, 1900, Beery parted with his equity to a one-half interest. The court, however, distinctly held that the action before it was not one by Whitney to compel White, or his grantee with notice, to assign any interest acquired under the partnership agreement, and distinctly declined to express any opinion whether or not such an agreement as had been entered into on September 7, 1899, between White and Whitney, could be made the basis upon which a court of equity would declare "a forfeiture." It was also the opinion of the court that Dewey was the owner of an undivided half interest in the property. Whitney v. Dewey, 10 Idaho, 633, 80 Pac. 1117, 69 L. R. A. 572, decided February 23, 1905. The present suit was instituted in the federal court August 7, 1905.

We look upon the agreement of September 7th as one of partnership. It was a contract where the parties contemplated, by joint effort, the promoting of a project for building a dam so as to create and use and sell water power for electrical and other purposes. Each agreed to give his best efforts to secure means immediately. Corporate organization was undoubtedly in the minds of Whitney and White, for, in dealing with Beery, they were to pay him in part by first mortgage bonds to be issued by a corporation to be formed to build a dam. But, whether in one form or another, and no matter how much or how little was accomplished, each of the parties became an owner in all property that was contributed and acquired in connection with the execution of the purposes of the association. The rights that had been initiated by Whitney individually prior to September 7, 1899, became the joint property of Whitney and White, share and share alike. White contributed no property to the partnership, but was anxious to join with Whitney, as he believed the rights which Whitney had contributed were valuable and could be made much more so. White was really a promoter, agreeing to contribute his energy and time with an exclusive right for a year to secure a half interest in the whole enterprise. But the parties provided for possible failure, and agreed that in case White should not be able to secure necessary funds to accomplish the undertaking within a year from September 7, 1899, or in the event of unsatisfactory progress on White's part within a year, White was to assign to Whitney all his right, title, and interest in and to the dam site, lands, rights, contracts, and privileges connected with the whole project that had been acquired by the partnership or either partner for the partnership. The plain purpose was this:

White was to get the necessary money and make the scheme an actually possible one; and to do so he had a year's time. If he could succeed, it would mean a great deal to him; but if he should fail, then he was to withdraw absolutely and assign every right he had to Whitney.

There are some principles which are thoroughly well established that bear upon the case, and will furnish grounds of equity and law upon which our decision must be placed. The first and highest duty which partners owe to each other is perfect good faith. Each is under obligation to do what he can to promote the success of their partnership. In every purchase or bargain each is under a duty to use the property of the concern for the benefit of all. In the requirement of good faith between partners, naturally, deceit, concealment, and false representations are forbidden. Parsons on Partnership, 225, says:

"If he (one partner) makes any private bargain with third parties for his own benefit, which either inflicts a loss upon the partnership, or turns to himself advantages which belong to all in common, he will be held to make compensation for this, or to restore these advantages to the partnership in some way. Thus, if the partnership have a valuable leasehold property, and, when it is about to expire, a partner privately gets a renewal of it to himself, he cannot take advantage of this to impose hard terms on his partners, but will be held to have obtained it for them as well as for himself."

Judge Story writes as follows:

"In cases, therefore, where real estate is purchased for partnership purposes and on partnership account, it is wholly immaterial, in the view of a court of equity, in whose name or names the purchase is made and the conveyance is taken, whether in the name of a stranger alone or a stranger jointly with one partner. In all these cases, let the legal title be vested in whom it may, it is in equity deemed partnership property not subject to survivorship, and the partners are deemed the cestuis que trust thereof. A court of law may, nay must, in general, view it only according to the state of the legal title. And if the legal title is vested in one partner or in a stranger, a bona fide purchaser of real estate from him, having no notice, either express or constructive, of its being partnership property, will be entitled to hold it free from any claim of the partnership. But if he has such notice, then in equity he is clearly bound by the trust; and he takes it cum onere exactly like every other purchaser of a trust estate."

Equity will apply its broad principles to real estate so as to secure to all parties their rights by regarding the legal estate as held in trust for the purposes of the partnership. This doctrine extends to carrying into effect implied, as well as express, trusts; and as is frequently the case in partnership relations where property is purchased in the name of one of the partners and the conveyance in form vests the legal title in one, equity will hold that he takes clothed with a trust for the partners in their partnership capacity, so as to secure the beneficial interest to them until the purposes of the partnership are accomplished. The consequence is that partnership property so held cannot be conveyed away by the partner alone who holds the legal title, without violating the trust. A conveyance made by the one partner would be invalid against the other, unless made to one who purchased in good faith, without notice, actual or constructive, of the trust. One who, knowing that a piece of real estate is the property of a partnership, pays

for a title to it from one partner alone, without the knowledge or consent of the other, takes the title that he gets at his peril, and on the responsibility of the person with whom he deals. These principles are clearly laid down in the following books: Dyer v. Clark et al., 5 Metc. (Mass.) 562, 39 Am. Dec. 697; Hoxie v. Carr et al., Fed. Cas. No. 6,-802; Phillips et al. v. Crammond et al., Fed. Cas. No. 11,092; Perry on Trusts, § 127. When, therefore, White, one of the partners, took the warranty deed from Beery to himself on January 25, 1900, a trust resulted to the partnership. The deed was delivered by Beery, and though both White and Beery believed there was a lack of delivery by Beery, and though they believed that it was subject to the accomplishment of their plans, as defined by the contract between White and Beery, dated December 26, 1899, nevertheless, under the rules of law, the deed was delivered unconditionally, and transferred Beery's entire legal title in the property to White, impressed in equity, however, with a trust for the partners and the partnership.

The decision of the learned Supreme Court of the state, in the action to quiet title, heretofore referred to, was that, tested by rules of law, White became vested with such a title from Beery as would enable him to pass a perfect title, and that no evidence of parol conditions was admissible for the purpose of showing a failure to vest title in White. With the judgment of the court upon the question there decided we are in accord; and we proceed upon the premise that Beery alienated his entire legal interest in the property by the deed to White. But, even so, the case before us is a very different one from that decided by the state court. There the action was to quiet title, but the rights, if any there are, in Whitney to compel White, or his grantees with notice, to assign under the contract of September 7th, were expressly not determined. It is substantially the question referred to, but left undecided by the Supreme Court, that has become the foundation of this suit. We have then before us the question whether equity will decree a specific performance under the contract of September 7th. Let us here say that the evidence does not show that this is really a suit to enforce a forfeiture, as respondent contends. Nor is it to enforce the provisions of an unfair and unconscionable agreement. The consideration for the contract between White and Whitney was an exclusive privilege to White for 19 months of acquiring a valuable property interest, if he could successfully exercise his energy and secure necessary money to build the dam. Assuming, for the present, that White acted in good faith, yet equity will not refuse to Whitney the enforcement of the contract as made. If White had obtained the necessary money, and Whitney had refused to perform his part, White could have compelled him to do so. Forfeiture usually signifies loss of property by way of compensation for injury to the person to whom the property is forfeited, as well as punishment. Nothing of that kind is involved herein, inasmuch as the remedy that Whitney seeks is one by which White, who violated his primary duty to convey, when circumstances arose requiring conveyance, may be compelled to do the very act which his duty and Whitney's primary right require from him. The case thus far, then, is this: On January 25, 1900, Beery had parted

with his whole title, and White held unrecorded warranty title to the lots for himself and his partner. Whitney, so far as the record enables us to pass upon his conduct, always dealt with White openly and fairly. He advanced his own means for the benefit of the project, and although at the end of the year White had not secured funds to make their plans successful, and Whitney could have dissolved the relationship, still, after assurances by White that he would be able to accomplish something if permitted to go on, he allowed the relationship to continue until about April 1, 1901. No intentional departure from the way they had been going on before was indicated, and it is evident that the provisions of the original articles were to be applicable to their association during its continuance. Parsons on Partnership, 239. White was still under an obligation to raise the necessary money to build the dam, and Whitney was under an obligation to use his best endeavors to promote the plan. Whitney still retained the right to dissolve the relationship if at any time White's progress was not satisfactory, or if he failed to get the necessary money, while White was still under obligation to assign all his rights to Whitney if such conditions of unsatisfactory progress or failure arose, and Whitney should elect to act upon them or either of them. About April 1, 1901, Whitney dissolved the partnership. The acts of dissolution consisted of an explicit verbal notice by Whitney to White that the progress was not satisfactory, and that their relationship must end. It was not a dissolution on terms, but a distinctly expressed announcement by one partner to another of dissolution of a partnership which was then at will; and from the moment of the announcement by the one partner, the partnership was terminated. In passing upon this point, we are not unmindful of the language of the learned judge who wrote the opinion of the Supreme Court of Idaho, denying a motion for a rehearing, to the effect that there was not sufficient proof of dissolution. We judge that at the trial in the state court the evidence of what was said by Whitney at the interview of dissolution was far less satisfactory than upon the trial had before the United States Circuit Court. Upon the testimony in the record before us, the proof of dissolution is ample; and we hold that from and after April 1, 1901, the partnership relation ceased.

White's duty to convey under the contract then arose; but he failed to perform without excuse. In May, Whitney, erroneously but honestly believing that the warranty deed from Beery to White had conveyed no valid title to the partners or either of them, in good faith purchased Beery's interest in the whole property (which was, at most, but an equity in the nature of a vendor's lien), and thereafter promptly had his quitclaim deed put upon record. The taking of the quitclaim, which, in its terms, conveyed the lots involved, was really unnecessary on Whitney's part, because, as we have said, Beery had already alienated his title by the warranty deed to White. The quitclaim operated to extinguish any possible lien that Beery might have had against the property for any unpaid price, and it also put the record title to the whole property in Whitney. It became notice to all that Whitney was a grantee of all the right, title, and interest

that Beery had in the property. Moelle v. Sherwood, 148 U. S. 21, 13 Sup. Ct. 426, 37 L. Ed. 350. This circumstance of itself ought to have warned Cobban and Casey that they could not buy from White, who held the unrecorded warranty deed, and claim protection as bona fide purchasers for a valuable consideration without notice. Sections 3000–3001, Rev. St. Idaho 1887. But when to the record notice there was added the positive actual knowledge of the previous relationship between Whitney and White, of its dissolution, and of Whitney's claim of exclusive ownership, all of which was told to Cobban by Whitney, they became purchasers from White with knowledge, and are to be held as having taken the undivided half interest conveyed as subject to the unextinguished trust in White, and to his positive duty to assign all his interest to Whitney. Oliver et al. v. Piatt, 3 How. 333, 11 L. Ed. 622. These observations apply with equal force to Dewey, the appellee, who, when he took a deed from Cobban & Casey, also had constructive and actual knowledge that Whitney claimed title to the whole tract. Appellee's actual knowledge was received in several ways. Before he bought he was told that Whitney claimed an interest, and he knew that Whitney and White had been associated in financial matters connected with the property. He was also the general manager and vice president of the Idaho Northern Railway Company, which was seeking a right of way over the lands affected by this litigation. Long before appellee took his deed from Cobban & Casey, he also knew of a condemnation suit instituted by the railway company against Beery et al. for such a right of way, and of the intervention of Whitney filed therein, claiming ownership of the whole tract. Appellee's position, therefore, is no better than that of Cobban & Casey; neither can stand on firmer ground than White himself could occupy.

We have thus far considered the case without regard to the secret contract made April 25, 1900, by Beery and White. We regard White's conduct in obtaining that conveyance, and in not advising his partner of it, as a willful fraud against Whitney. It was done in direct violation of every rule of good faith, and of the written obligations of their partnership articles. White's purpose evidently was to get Whitney out, and, in trying to do so, he concealed the truth and deceived his partner. But it does not appear that appellee or Cobban & Casey knew of the willful fraud or participated in it; hence they should not and cannot be charged therewith. Their attitudes are as heretofore explained—purchasers with knowledge of the quit-claim deed from Beery to Whitney and of the business association of White and Whitney, and of Whitney's claim of exclusive ownership. These several pieces of information are sufficient, as we have shown, without regard to the willful fraud of White, to defeat appellee's claim of right in the property. Consequently, White's willful fraud and the secret deed are not material to the decision of the case. It may be unfortunate for Cobban & Casey and Dewey that as White's grantees and successors they will suffer some pecuniary loss as a result of their purchase, but they are none the less fortunate in being free from implication in those parts of his conduct which showed intent to defraud his partner.

We cannot see that Whitney has ever waived any rights. His leniency in not dissolving the partnership after the first year of the contract with White was for White's benefit, in that it gave him further time in which he might raise necessary funds; but there is no evidence at all of intention to release White from his obligation to convey, if he failed to raise the necessary means, and no presumption in favor of such a waiver is to be indulged in.

Laches are charged. But Whitney has been active and persistent since May, 1902, when he intervened in the condemnation suit referred to, in seeking judicial determination of his claims. How, then, can it be said that he has slept on his rights? He relied upon the statements of his partner, White, that no title was conveyed by the deed of January 25th, and knew nothing of the secret contract of April 25th between Beery and White until the action to quiet title was tried in the state courts.

One other point remains for consideration. It appears that in 1900 White, acting for the partnership, employed one Banister to make a report concerning the property. Banister was not paid, and thereafter obtained judgment against White, and attached the property of the partnership. When White sold to Cobban & Casey, Cobban paid to one Neil for Banister the sum of $561.75—the amount of the judgment held by Banister. This sum was therefore paid for services rendered for the benefit of the firm, and we think it but equitable that it should be paid back to this appellee, who purchased from Cobban & Casey for more than they had paid. No other sum need be tendered or paid back to appellee by appellant, for the reason that appellant is only insisting upon the performance of his contract with White, under the terms of which appellant is entitled to a conveyance without paying any sum. Moreover, the evidence shows that all that complainant was obliged to do—and more, in fact, in that he advanced money for expenses, for which White alone was liable—was done by him. Appellee can occupy no better position than the most favored one which can be assumed for White, namely, that of a purchaser in trust for the person beneficially interested. Jackson v. Lynn, 94 Iowa, 151, 62 N. W. 704, 58 Am. St. Rep. 386; Pomeroy's Equity Jurisprudence, § 422.

Finally, looking at the whole case, we think that the rule must prevail whereby appellee is liable in equity to the same extent and in the same manner as his vendors, Cobban & Casey, and Cobban's and Casey's vendor, White; that, having acquired with full notice of the trust, he became himself a trustee for Whitney with respect to the property, and is bound to assign as the original trustee, White, himself, would be.

The decree of the Circuit Court will be reversed, and the cause remanded, with directions to enter a decree that, upon payment to appellee by appellant of the sum of $561.75, with interest thereon from August 1, 1901, at the legal rate allowed by the law of the state of Idaho, amount paid in satisfaction of the Banister judgment, appellee assign to appellant by quitclaim deed all his right, title, claim, and

interest in and to the property involved herein, as described in complainant's bill, and as described in the quitclaim deed from Cobban & Casey, dated September 27, 1902, to appellee, E. H. Dewey.