MARTIN *v.* CALL CARL, INC., ET AL.

[No. 146, October Term, 1952.]

*Decided May 15, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Stedman Prescott, Jr.,* with whom were *Donald K. Staley* and *John F. Hillyard* on the brief, for appellant.

*Joseph B. Simpson, Jr.* and *H. W. Wheatley, Jr.,* with whom were *Vivian V. Simpson* and *Simpson and Simpson* on the brief, for appellees.

HENDERSON, J., delivered the opinion of the Court.

This case originated as an interpleader suit instituted by Western Union Telegraph Company, as a tenant of part of the premises known as 8511 Colesville Road in Silver Spring, Maryland, to determine which of the parties named as defendants, Wilbur W. Martin and Call Carl, Inc., was entitled to receive the rents due and to become due on the premises. The court signed an order naming Martin plaintiff and Call Carl, Inc., defendant. Appropriate pleadings were filed, whereby the defendant claimed the rent under a sub-lease and assignments which the plaintiff asserted to be void. The owners of the property intervened as defendants. After the taking of testimony before an examiner and the filing of certain stipulations the chancellor found for the defendant.

The evidence showed that in 1944 Martin and one Henry W. Lowe entered into an unwritten partnership agreement to engage in the used car business and share the profits equally, trading under the name of Lomar Motor Company. Martin was a doctor, practicing in Washington, D. C., and supplied the capital; Lowe was the active member. In June, 1944 they leased from William A. Walsh and Edna O. Walsh the commercial property in question for a period of five years, with a

right to renew for another five year period, and conducted the business there until late in 1947, when they suspended operations. In March 1948 they sub-let room 10 in the building to the Western Union Telegraph Company, with the consent of the lessors. Lowe made this sub-lease without the knowledge or consent of Martin, but he subsequently ratified it and it is not here in question. In 1949 they exercised their option to renew the lease for another five years, and sought to sub-lease the remainder of the building. On September 20, 1949 Martin and Lowe went to the office of Call Carl, Inc. in Washington in an effort to negotiate a sub-lease. They reached an oral agreement as to terms, which was reduced to writing by Philip Shinberg, attorney for the partnership. The agreement called for Martin's signature and acknowledgement. It also provided that monthly rental payments of $550 be made to Martin, personally at his Washington office. At a subsequent meeting between Lowe, representatives of Call Carl, Inc., and their respective attorneys, at which Martin was not present, the written agreement was executed by the officers of the corporation and delivered to Lowe for the purpose of having Dr. Martin execute it. It was later delivered to the attorney for Call Carl, Inc., bearing the purported signature of Martin and his acknowledgement, whereupon a check for four months rent and certain other checks covering equipment and adjustments, all payable to Lomar Motor Company, were delivered to Lowe. A few days later, Lowe talked to Mr. Carl about an assignment of the lease for a cash consideration. They finally agreed on a price of $9,000 for the assignment. An assignment was prepared to be signed by the partners. On September 29, 1949 Lowe delivered the executed assignment and received a check payable to Lomar Motor Company. At the same time Lowe purported to assign the sub-lease with Western Union to Call Carl, Inc. by endorsing thereon the name Lomar Motor Company, "by Henry W. Lowe". Lowe cashed all the checks received, took the money and departed for California. Mar-

tin demanded possession of the premises from Call Carl, Inc., on the ground that he had not executed any of the documents delivered to Call Carl, Inc.

It was clearly shown that Lowe had forged the name of Martin to the sub-lease dated September 20, 1949 and to the assignment of lease dated September 29, 1949 to Call Carl, Inc., and that the sub-lease was notarized in the District of Columbia by a Maryland notary who admitted that Martin had not appeared before him or acknowledged the instrument. It was also shown that Martin had no knowledge of Lowe's actions subsequent to the negotiations at which he was present, had not authorized Lowe to negotiate for an assignment, and was totally unaware of the transaction. He admitted that the sub-lease was in the form agreed upon and that he would have signed it if it had been presented to him together with checks payable to him in the amounts agreed upon. He admitted that at the time of the negotiations at which he was present he had in his possession a paper executed by Lowe dated June 30, 1948 assigning all Lowe's interest in the original lease to Martin. He did not disclose this to Call Carl, Inc., or to anyone else, because he "didn't think it was good business." He stated at that time that Lowe was his partner.

The chancellor held that Call Carl, Inc. was entitled to the rents from Western Union, accounting from October 1, 1949, on the ground that Martin was estopped from denying the partnership and bound by Lowe's actions. We think the decision cannot be supported.

It is quite true that the action of Martin in holding out Lowe as his partner, after Lowe had executed an instrument assigning to him all of his interest in the lease, would estop him from denying the existence of the partnership. *McBriety v. Phillips,* 180 Md. 569, 26 A. 2d 400, and cases cited. But in order to invoke the doctrine of estoppel, it must be shown that the creditor acted in reliance upon the representations at the time he entered into the transaction. In the instant case Martin did not authorize Lowe to execute the sub-lease

for him or in the name of the partnership, nor did the other parties rely upon any such apparent authority in executing the agreement. On the contrary, the paper when prepared called for Martin's signature and acknowledgement. The money was paid in reliance upon Martin's forged signature and false acknowledgement, not in reliance upon any representation by him. Since the tentative agreement contemplated the execution of a written document to be signed by both partners, the contract was not complete and was subject to disavowal until formally executed. *Kaufmann v. Adalman,* 186 Md. 639, 648, 47 A. 2d 755. As pointed out in that case, the contract, until signed, was unenforceable under the Statute of Frauds, since it was a contract for an interest in land.

The appellee concedes that the forged signature was wholly ineffective, but seeks to invoke the principle that where one of two innocent persons must suffer by the act of a third, he must bear the loss who by his conduct has made it possible. But as stated in *Merchants Bank v. Steamboat Co.,* 102 Md. 573, 584, 63 A. 108, 112, "this principle has no application to a case where the instrument has been forged." The court cited with approval *Walsh v. Hunt,* 120 Cal. 46, 52, 52 P. 115, 39 L. R. A. 697, for the proposition that "no one is bound either to anticipate or take precaution against the commission of a crime by which another may be defrauded; that while it is through the instrumentality of a criminal act that the wrong is accomplished, it is the crime and not the negligent act which is the proximate cause of the injury, * * *". See also note 78 A. L. R. 471. The case of *Washington Loan & Trust Co. v. United States,* 77 U. S. App. D. C. 284, 134 F. 2d 59, relied upon by the appellee, rests on a provision of the Negotiable Instruments Act. *Cf. Union Trust Co. v. Soble,* 192 Md. 427, 431, 64 A. 2d 744, 746. Under the statutory rule, it was there said that "any conduct, silence, or laches which misled the bank to its prejudice," might preclude the drawer of a check from setting up the defense of forgery. See

also *Home Credit Co. v. Fouch,* 155 Md. 384, 396, 142 A. 515.

But even if we should apply this test, we think the facts do not show any negligence or breach of duty on the part of Martin. He quite naturally assumed that the paper, prepared for his signature in accordance with the understanding of all the parties, would be submitted to him in due course. He had been brought to the conference at the insistence of Carl, who admitted he told Lowe "we could do no business unless he brought his partner in the presence of our attorney and made an appointment." Moreover, Carl admitted that Lowe told him "he [Lowe] wouldn't get anything out of it, but he wanted to get Dr. Martin paid out and get out of the business." The agreement specifically provided that the monthly installments should be paid to Dr. Martin, not to the partnership.

What we have said about the sub-lease applies with even greater force to the assignment a few days later. Dr. Martin had never considered such an assignment or discussed it with anyone, and was still unaware that his name had been forged to the previous document and a check, payable to the partnership, delivered to Lowe. It was the blind confidence placed in Lowe by Carl, and the attorneys, not any act of Martin's that made the fraud possible. No one saw fit to communicate with Martin, although it would have been easy to do so. The assignment recited that it was intended to extinguish and merge the sub-lease to Call Carl, Inc., to include the portion of the building "now under lease and occupied by the Western Union Telegraph Company, Inc.", known as Room 10, and to convey "all right, title and interest, (both as individuals and as partners in the Lomar Motor Company) in and to one certain lease between the parties of the first part and the Western Union Telegraph Company, Inc., dated March 17, 1948; said lease being made a part hereof." Thus, the indorsement on the lease referred to, in the partnership name signed by Lowe alone, was merely a detail, unsupported by any new considera-

tion. Reliance for the whole transaction, whereby the sub-lease was to be superseded by assignment of the original lease, was upon the signature of Martin.

These facts seem to dispose of the contention that Martin was estopped, by holding out Lowe as a partner, from challenging the conveyance. There was no reliance upon any representation that Lowe could act for the partnership in the matter. There was insistence that Martin join in the instrument. The most that could be claimed is that Lowe conveyed his individual and partnership interest, which in fact was nothing, because he had already released his interest to Martin. While this fact was not made known to Call Carl, Inc., Carl knew that Lowe "wouldn't get anything out of it." We find it unnecessary to pass on the question discussed in the briefs as to whether, under other circumstances, Lowe could have conveyed a capital asset of the partnership in the partnership name, without the joinder of Martin or by his express authority. See Sections 9 and 10, Article 73A, Code of 1951; *Whitney v. Dewey,* 9 Cir., 158 F. 385; *In re Messenger,* D. C., 32 F. S. 490; *Riss & Co. v. Feldman,* D. C., Mun. App., 79 A. 2d 566; *Petrikis v. Hanges,* 111 Cal. App. 2d 734, 245 P. 2d 39; *Swanson v. Webb Tractor & Equipment Co.,* 24 Wash. 2d 631, 167 P. 2d 146. We must therefore reverse the decree, with directions to enter a decree in accordance with the views herein expressed.

*Decree reversed, with costs.*