**CAMBRIDGE, INC.**

v.

**The GOODYEAR TIRE & RUBBER COMPANY.**

**Civ. No. Y–77–990.**

United States District Court,
D. Maryland.

June 4, 1979.

---

David R. Cohan, Baltimore, Md., for plaintiff.

John Henry Lewin, Jr., Baltimore, Md., and Nell B. Strachan, Baltimore, Md., counsel for defendant.

JOSEPH H. YOUNG, District Judge.

Plaintiff Cambridge, Inc., a Maryland corporation, has filed a two-count complaint against the Goodyear Tire & Rubber Company, an Ohio corporation, asserting breach of contract claims arising out of lease negotiations in 1975, 1976 and 1977. Plaintiff seeks damages of $1,000,000 for each count. Jurisdiction is based on diversity of citizenship, and allegations of an amount in controversy in excess of $10,000. *See* 28 U.S.C. § 1332 (1970).

This case is presently before the Court on defendant's motion for summary judgment in which it contends it is entitled to judgment as a matter of law because plaintiff's cause of action is barred by the Statute of Frauds, Md. Real Prop. Code Ann. §§ 5–103, § 5–104 (1974).

*I. FACTS*

Extensive discovery, including depositions, admissions, and answers to interrogatories, has established the following chronology of events. Plaintiff owns the Cambridge Plaza Shopping Center in Cambridge, Maryland. The defendant was and continues to be one of the major tenants of this center. The lessor-lessee relationship began with a lease entered into in 1968, and which continues to 1980 with subsequent options. This underlying lease is not in dispute. In July, 1972, plaintiff consented to the subleasing of the store to one of defendant's franchisees, Jerry Nolan, Inc., for use as a Goodyear Tire Center. Jerry Nolan, Inc., has been in possession of the store since that time.

In 1974, plaintiff proposed that defendant give up its present store to allow one of its other tenants, Safeway Stores, Inc., to expand its operation. Plaintiff offered to construct a new store for the defendant in accordance with the latter's plans. Defendant initially refused this proposal, and the plaintiff's subsequent attempts to negotiate an agreement generated this lawsuit.

On October 1, 1975, Paul J. Smith, Manager of Real Estate for defendant, Charles A. Knott, plaintiff's president, Francis J. McGuinness, plaintiff's vice president, and Jim Barnett, then head of defendant's franchise operations met at Goodyear's headquarters in Akron, Ohio to discuss plaintiff's proposals. All of these persons have been deposed. McGuinness testified that he felt that an "agreement" had been reached at this meeting:

> We left Akron, we left with the idea that we had resolved all of the problems once and for all, and there wasn't any doubt that we had a contract, we had a handshake, we had an agreement, and was finally relieved that certainly Goodyear, with all of the organizations they have, all of the real estate endeavors, they finally got this thing resolved and that was with the free-standing store out front.

McGuinness Deposition at 121–22. He further stated that Smith and Barnett had told him that they would recommend the agreed-upon terms to Goodyear's management. In response to a query as to his understanding of the authority of Smith and Barnett, McGuinness said: "[Smith] was management and I assumed that he could make deals and he could sign leases. . . . He said, we have a deal. When we shook hands, we had a deal. . . . I thought he had the authority to amend this lease, for this location." *Id.* at 129, 131.

Knott similarly interpreted the meeting as establishing a "deal." The following colloquy represents his understanding of what occurred at the October 1 meeting:

> "Q. Well, tell me about the October 1, 1975 meeting in Akron. You and Mr. McGuinness went out to Akron?
>
> A. We went out to Akron.
>
> Q. At Mr. McGuinness's request, right?
>
> A. At my request to have a meeting with Mr. Smith. I told him to set up a meeting out there, I want to go out and find out what the prob-

lems, if they have problems, what they were. We arrived at Akron, rented a car and went to the Goodyear factory and had a very cordial meeting with Mr. Smith and he brought Mr. Barnett into the meeting as the franchise manager. We discussed Cambridge and Mr. Smith inferred that he would like to be out front, he always wanted to be out front in a shopping center.

Q. You mean in a free-standing store?

A. In a free-standing store. I said, if that's the only problem, I said, I'll make a deal. He says what's the deal? I said, I'll make a deal for two and a quarter, give you everything you got, conditions of the other lease and everything, and put you out in front. He said, you've got a deal. So, to me, a deal is a deal. In my 50 years of business, this is the way I've done business all my life and, when I shake hands with a deal, I live up to my deals and I expect everybody else to live up to their deals, with the same terms and conditions. That's the way we left Akron and, with that, Mr. Smith—Mr. Barnett was excused after further discussions, inferring he would take care of whatever their problems were with Mr. Nolan, and Mr. Smith took us from there into a big hall, showing plants all over the world he had charge of, all this great big empire under his domination, worldwide, as far as head of real estate for Goodyear Tire Company."

Knott deposition at 24–25.

Smith testified that he felt that Cambridge's proposal had merit, and that he was willing to recommend it to Goodyear management for approval, subject to gaining approval from Jerry Nolan, Inc., the franchisee/sub-lessee. Because of this need for Nolan's approval, Smith did not believe he had the authority to bind Goodyear without further word from his superiors. *See* Smith's deposition at 17–18, 51–52.

In January, 1976, Goodyear sent to Cambridge a document which the parties have called the "January 1976 Lease." The document, a form lease, was attached to plaintiff's complaint as exhibit "B". It contains numerous interlineations and changes apparently made by McGuinness. The document was returned to Goodyear in February, 1976. Defendant's signature does not appear on the proposed lease, plaintiff stating in its complaint that "Defendant did not execute the January, 1976 Lease." *See* Plaintiff's complaint at 3, ¶ 6. Plaintiff, however, felt it had an "agreement" at this point, and it states that "in reliance upon" it, it refinanced the entire shopping center, paid the existing mortgage, and obtained a new mortgage. *Id.*

By a letter from McGuinness to D. L. Gardiner dated June 25, 1976, the plaintiff informed Goodyear that it felt the proposed relocation of Goodyear's store "was negotiated and agreed upon," and stated: "We cannot indefinately tolerate delays and therefore, if we do not receive a response by July 15, 1976, we hereby withdraw our offer and the proposed lease with Goodyear is declared null and void." (A copy of this letter is Exhibit I to Defendant's Motion for Summary Judgment).

In January, 1977, another proposed fifteen-year lease (the "January, 1977 Lease") was forwarded from Goodyear to Cambridge. This document is unsigned, plaintiff stating in its complaint: "the defendant has failed and refused and continues to refuse to execute the January, 1977 Lease . . . ." *See* Plaintiff's complaint at 4, ¶ 7. It was returned to Goodyear in February, 1977, with several changes made by McGuinness.

Goodyear apparently incorporated McGuinness' changes to the "January, 1977 Lease," and forwarded a third proposed lease to plaintiff in February, 1977. Although McGuinness signed this document for Cambridge and returned it to the defendant, Goodyear has not signed it. A copy of this document may be found as attachment "9" of Defendant's January 27, 1978 Request for Admission.

In June of 1977, plaintiff filed the present action. It bases its claim on "an agreement whereby the plaintiff agreed to construct a new store at the Center in accordance with plans prepared by the defendant and the new store was to be occupied by the defendant pursuant to the terms of a new lease." Plaintiff's complaint at 2, ¶ 5. In an answer to an interrogatory, plaintiff has identified the "agreement" upon which it relies. The interrogatory and the answer are as follows:

"14. (a) State and describe the agreement you allege was reached on or about October 1, 1975 in Akron, Ohio.

(b) If you contend that plaintiff and Goodyear reached any other agreements, identify and describe all such other agreements.

(c) Identify all persons having knowledge of any and all agreements described in parts a and b of your answer, and identify all documents which relate to, refer to, memorialize or evidence those agreements."

*ANSWER:* "(a) The Agreement in principle which was reached on October 1, 1975 in Akron, Ohio concerned Goodyear having a free standing structure in lieu of its store connected to the Safeway store in Cambridge Plaza. Such free standing structure was to be free of construction costs to Goodyear. (b) Yes (1) January, 1976 lease submitted by Goodyear to Plaintiff. (2) January, 1977 lease submitted by Goodyear to Plaintiff. (3) February, 1977 lease submitted by Goodyear to Plaintiff. (c) Frank J. McGuinness; Mr. Barnett of Goodyear; Mr. P.J. Smith of Goodyear; Charles Knott; those persons who initialled on behalf of Goodyear the Feburary, 1977 lease submitted to Plaintiff. (1) Three of five index card establishing rent, square footage, shape, those present at October 1, 1975 Akron meeting and the location of the building; 10/1/75. Such card is consistent with the terms of the January 1976 lease submitted to Plaintiff by Defendant. (2) January 1976 lease and cover letter submitted by Goodyear to Plaintiff. (3) Inter-office Goodyear memorandum signed by D.L. Gardiner; 6/29/76. (4) January, 1977 lease and cover letter submitted by Goodyear to Plaintiff. (5) February, 1977 lease and cover letter submitted by Goodyear to Plaintiff."

Thus, plaintiff appears to contend that the October 1, 1975 "handshake" agreement, and the subsequent proposed leases submitted to it by defendant in 1976 and 1977, collectively constitute a legally binding contract. It is significant to note that plaintiff does not contend that Goodyear actually signed any of the documents involved. This is clearly demonstrated by the following deposition testimony of McGuinness:

"Q. Well, the lease you referred to coming from Goodyear wasn't in fact signed by Goodyear, was it?

A. No.

Q. It never has been signed by Goodyear?

A. No. I don't have a signed copy.

Q. There isn't anything signed by anybody at Goodyear agreeing to move into the free-standing store?

A. No."

*See* McGuinness deposition at 156.

## II. DISCUSSION

Federal Rule of Civil Procedure 56(c) provides in pertinent part that summary judgment:

shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Having considered the relevant undisputed facts, it is apparent that no genuine issue of fact exists and defendant's motion for summary judgment should be granted.

Initially, it must be noted that this Court will apply the Maryland law on contracts, equitable estoppel, and the Statute of Frauds. *See American Security and Trust Company v. Fletcher*, 490 F.2d 481, 484 (4th Cir.), *cert. denied*, 419 U.S. 900, 95 S.Ct. 184, 42 L.Ed.2d 146 (1974).

The Statute of Frauds has been a part of Maryland jurisprudence since the earliest days of the state. *See generally*, J. Alexander, A collection of the British Statutes in force in Maryland (1870). In 1957 and 1974, the Maryland legislature codified the Statute's provisions in the Real Property Article of the Maryland Annotated Code. Section 5–103 of the Code provides:

> No corporeal estate, leasehold or freehold, or incorporeal interest in land may be assigned, granted, or surrendered, unless it is in writing signed by the party assigning, granting, or surrendering it, or his agent lawfully authorized by writing, or by act and operation of law.

Md. Real Prop. Code Ann. § 5–103 (1974). Also pertinent is § 5–104 which states:

> No action may be brought on any contract for the sale or disposition of land or any interest in or concerning land unless the contract on which the action is brought, or some memorandum or note of it, is in writing and signed by the party to be charged or some other person lawfully authorized by him.

Md. Real Prop. Code Ann. § 5–104 (Cum. Supp.1978). This codification made no substantive changes to the English Statute of Frauds which was part of the common law of Maryland. Thus, the pre-codification case law remains controlling. *See* Comment to Title 5 of the Real Property Article, Md. Real Prop. Code Ann. §§ 5–101 to 5–108 (Cum.Supp.1978).

When the above-quoted sections of the Statute of Frauds are applied to the facts of this case, it is clear that defendant's motion for summary judgment must be granted because none of the purported leases was "signed by the [defendant] or some other person lawfully authorized by him." In *Kaufmann v. Adalman*, 186 Md. 639, 47 A.2d 755 (1945)—a case both legally and factually on point—the Maryland Court of Appeals invoked the Statute of Frauds to dismiss an action for the breach of an alleged five-year lease agreement. There, prospective vendors and vendees had orally agreed to the terms and conditions of a lease, and a proposed written lease had been prepared. With the exception of certain minor changes, the attorneys for both sides had incorporated the oral agreement into the written lease. While it was being retyped, the vendors advised the vendees that they would not go through with the deal, and that they had given a third party an option to purchase the property. The disappointed vendees filed suit for specific performance, attaching the written but unsigned lease to their complaint. The trial court dismissed the complaint, and the vendee/plaintiff appealed.

The Court of Appeals affirmed, finding that the action was barred by the Statute of Frauds because the lease was not signed by the defendant. It stated: "It is perfectly apparent that a contract to lease, like the case at bar, should be evidenced by a writing signed by the parties to be charged, or some person lawfully authorized." *Id.* at 645, 47 A.2d at 758. In response to plaintiffs' argument that the fact that defendants' name was typed into the body of the lease satisfied the signature requirement, the court stated:

> It would seem to be manifest that neither the Kaufmanns [plaintiffs] nor Max Lazarus & Sons [defendants] intended the lease, Exhibit 1, to be executed by either of them, because the names of the respective parties were typewritten in the *testimonium* clause of that instrument. That it was not thereby regarded as having been executed is conclusively shown by typewriting immediately following the *testimonium* clause: "Max Lazarus & Sons By" and immediately thereunder three blank lines, and beneath each line are the words "One of the Partners," and "David Kaufmann's Sons By" and two blank lines, immediately under each of which are the words "One of the Partners." All of the lease, Exhibit 1, is typewritten and in this respect it is unlike our will cases referred to, where the instruments were in script, and in those cases it was clear that the signature was intended to authenticate the instrument and that the same was a completed document. In the case at bar this lease is

wholly typewritten, and no part of it is in script.

*Id.* at 647, 47 A.2d at 759. As to the "minor changes" made to the original oral agreement by the parties' attorneys, the court said:

> If the terms alleged to have been agreed upon by the parties, prior to this meeting of their attorneys, were changed in the typewritten lease, the parties had a right to either accept or reject the changes made by the attorneys. The terms of a proposed contract cannot be changed by the attorneys for the parties, to whom was left the drafting of the contract, and it will not do when changes are so made, to say that they were minor. . . . This change between the terms agreed on and the terms contained in the typewritten lease amounted to a rejection of the prior terms and a proposal of the original terms and conditions with modifications.

Finally, the court concluded that no oral agreement had been reached because a formal, executed, written contract was contemplated by the parties:

> Neither party acquired any right against the other respecting the matter in hand during the negotiating, because it was their intention that no contract would result until the terms thereof were reduced to writing and signed by the parties. The appellants must have known this and if they assumed, under these circumstances, that negotiations amounted to a contract, when in point of fact and in law the negotiations did not amount to a contract, whatever they did, upon their mistaken assumption, and whatever loss resulted therefrom, cannot be attributable to Max Lazarus & Sons [the defendants].

*Id.* at 649, 47 A.2d at 760.

■ The Maryland Court of Appeals has applied the *Kaufmann* holding to other cases involving facts very similar to those in this case. *See, e. g., Krauss v. Litman,* 189 Md. 394, 56 A.2d 37 (1947) (unsigned "agreement" for sale of land insufficient to support an action for specific performance); *Martin v. Call Carl, Inc.,* 202 Md. 399, 96

A.2d 504 (1952) (lease signed by plaintiff but not by defendant insufficient to satisfy the Statute of Frauds). *See generally,* 11 Md. Law Encyclopedia, Frauds, Statute of, § 47 (1960) (discussion of signature requirement). *Kaufmann* and its progeny thus established that when negotiating parties contemplate a formal written agreement, their negotiations remain negotiations until the agreement is reduced to writing, and when an oral agreement to transfer an interest in land is made, such agreement is unenforceable under the Statute of Frauds.

■ Here, although there may be a factual dispute as to whether an oral "agreement" or a "deal" was reached at the October 1, 1975 meeting, it is clear that defendant has not signed any of the documents proffered by plaintiffs to create a contract. This is established by McGuinness' deposition testimony, and by the admissions in plaintiff's complaint, both quoted above. It is true that the name "Goodyear" was printed in the three proposed leases. However, these documents also provided blank spaces for Goodyear's written signature. As in *Kaufmann,* the existence of these blank spaces is conclusive evidence that Goodyear did not intend the typed name to bind it as a legal signature. On this point, *see generally* 11 Md. Law Encyclopedia, Frauds, Statute of, § 47 ("It is a sufficient signing of an instrument for purposes of the Statute of Frauds, if the name is in print and in any part of the instrument, *provided the name is recognized and appropriated by the party to be his.*") (Cum.Supp. 1978)(emphasis added). In sum, the plaintiff's actions must fail because it has not produced a "contract . . . or some memorandum or note of it, . . . in writing and signed by the party to be charged or some person lawfully authorized by him." Md. Real Prop. Code Ann. § 5–104 (Cum.Supp.1978).

■ Plaintiff may argue that the doctrine of "part performance" prevents the operation of the Statute of Frauds. Even assuming that an oral agreement could be proved, this argument must fail. It has

been held that where an oral contract relating to real property is affirmatively established by clear and convincing evidence and the promisee has performed fully by rendering services of a unique and substantial character, the contract is taken out of the operation of the Statute of Frauds. *See, e. g., Mannix v. Baumgardner*, 184 Md. 600, 42 A.2d 124 (1945). Generally, courts have required payment, or possession of or improvements upon the property in question to take the oral contract out of the operation of the Statute of Frauds. *See generally*, 11 Md. Law Encyclopedia, Frauds, Statute of, § 68. Here, no part of the proposed new building has been constructed by Cambridge, nor was any rent paid by Goodyear. There is no "part performance." Moreover, even if "part performance" was established, this Court notes that this action is one for purely *legal* remedies ($2,000,000 in damages) and that the doctrine of "part performance" has been applied by the Maryland courts only in actions for *equitable* relief. *See Kline v. Lightman*, 243 Md. 460, 221 A.2d 675 (1966); *Hamilton v. Thirston*, 93 Md. 213, 48 A. 709 (1901). *See generally*, 11 Md. Law Encyclopedia, Frauds, Statute of, § 65.

■ Count two of plaintiff's complaint puts forth a claim of equitable estoppel. Plaintiff alleges that it "relied upon the promises and representations of the defendant," and that therefore "defendant is . . . estopped from [denying] the existence and validity of the agreement. . . ." Plaintiff's complaint at 4, ¶ 2. In *Liberty Mutual Ins. Co. v. American Automobile Ins. Co.*, 220 Md. 497, 154 A.2d 826 (1959), the Maryland Court of Appeals explained the doctrine of equitable estoppel in this manner:

> Equitable estoppel has been defined as "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy." 3 Pomeroy, *Equity Jurisprudence* (5th ed. 1941), § 804. Since the application of the doctrine depends upon the facts and circumstances in each case, it will not be applied unless it is shown that the person sought to be estopped has been guilty of some wrongful or unconscientious conduct upon which another relied and was misled to his injury. *Rodgers v. John*, 131 Md. 455, 102 A. 549 (1917). See also *Pearre v. Grossnickle*, 139 Md. 1, 114 A. 725 (1921).

*Id.* at 500–01, 154 A.2d at 828.

Plaintiff apparently seeks to recover the costs it incurred in refinancing the shopping center, claiming that they were caused by its "reliance" on an "agreement" with Goodyear. However, McGuinness has testified that these refinancing negotiations began before the October 1, 1975 meeting in Akron, when the earliest "agreement" was allegedly made. *See* McGuinness deposition at 142–43. There is no allegation of any action by the defendant upon which the plaintiff reasonably relied to its detriment.

Accordingly, it is this 4th day of June, 1979, by the United States District Court for the District of Maryland, ORDERED:

1. That the defendant's motion for summary judgment be, and the same is, hereby GRANTED, and

2. That a copy of this Memorandum and Order be sent to the plaintiff and to the defendant.