AMERICAN SECURITY AND TRUST COMPANY, Trustee in Reorganization of Parkwood, Inc., Appellant,

v.

Keith N. FLETCHER, Appellee.

No. 73–1235.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 2, 1973.

Decided Jan. 21, 1974.

John S. Hoff, Washington, D. C. (Robert E. Lieblich, William W. Koontz, Alexandria, Va., and Leva, Hawes, Symington, Martin & Oppenheimer, Washington, D. C., on brief), for appellant.

Bolling R. Powell, Jr., Washington, D. C. (Powell, Horkan & Powell, Washington, D. C., on brief), for appellee.

Before CRAVEN, BUTZNER and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

The question here is whether the defendant, Keith N. Fletcher, may be liable to the plaintiff, American Security and Trust Company (acting as a trustee in bankruptcy), on account of Fletcher allowing one Bruce Noland, a real estate speculator, to use his (Fletcher's) financial statement to present to the bankruptcy court [A1] for its consideration in deciding whether or not to sell certain land to Noland. The issues presented are whether certain of the district court's findings of fact were clearly erroneous and must be set aside, and whether Fletcher's actions in allowing his financial statement to be used by Noland in support of Noland's offer to purchase makes Fletcher liable as a purchaser. We find in favor of the trustee on both issues, and we reverse.

The trustee is a District of Columbia corporation which had acquired title as trustee to the properties of Parkwood, Incorporated, under the terms of Chapter X of the Bankruptcy Act. One of the major properties involved was two adjoining tracts of land located in Fauquier County, Virginia, and known as the North Wales-Ullman property. This property was subject to various secured debts totaling approximately $1,322,000 as of December 31, 1966. The trustee determined that the property should be sold and solicited offers. The best offer it had received as of February 15, 1967 was Noland's offer of $1,665,000.

Noland's offer of $1,665,000 was included in a sales contract dated February 15, 1967, which provided that the offer would be accepted upon the bankruptcy court's approval of the contract, and that before approval there would be opportunity to receive higher bids. The judge of the bankruptcy court referred the matter for hearing to the referee in bankruptcy as a special master by order entered March 6, 1967. At the special master's hearing on March 30, 1967, additional bids were received for the property. Noland again was the high bidder, offering $1,900,000, with a $5,000 deposit and 30-day closing. The special master, at this hearing, advised the bidders that he desired financial statements of the principals responsible for the bidding to be submitted within a week.[1]

Noland first talked to Fletcher concerning the property on April 12, 1967, and Fletcher gave Noland his financial

---

[A1]. The U. S. District Court for the District of Columbia.

[1]. The bids at the hearing of March 30, 1967 were:
Noland—$1,900,000 price, $5,000 deposit, 30 day closing.
Thompson—$1,866,000 price, $15,000 deposit, 90 day closing.
Glassie—$1,800,000 price, $150,000 deposit, 30 day closing.

Financial statements were then submitted, on April 12, 1967, by Noland for himself, Naylor, and Fletcher; and by Glassie for E. DeLong Bowman and A. Smith Bowman, Jr. Thompson filed no financial statement.

The financial statements filed in this record show the net worth of Noland to be $971,460.52; of Naylor $1,977,363; and of Fletcher $2,195,140.48.

statement on that date. Noland, on or before April 10, 1967, also had obtained a financial statement from one G. R. Naylor, Jr. By letter dated April 12, 1967, filed in the bankruptcy court on April 13, 1967, Noland submitted his own financial statement and those of Fletcher and Naylor as those of the "principal[s] involved . . . as well as my own financial statement." Noland also attached a paper showing a "total net worth" of $5,143,964 for Fletcher, Naylor and Noland, and two documents purporting to be copies of letters from Noland to Naylor and to Fletcher requesting them as "principals" to furnish their financial statements for forwarding to the bankruptcy court. Both Naylor and Fletcher denied ever receiving the letters.

A hearing was held before the special master concerning creditors' objections to the sale of the North Wales-Ullman property on April 13, 1967. The special master acknowledged that he had received the financial statements of Fletcher, Naylor and Noland, but only Noland was present at the hearings. On May 8, 1967, Noland submitted an additional letter to the bankruptcy court in which he referred to his submission of the financial statements of the "prospective purchasers" as showing assets in excess of $5,000,000. The special master, on May 9, 1967, recommended to the judge that the proposed sale to Noland be approved, and he included with his report, without comment, the financial statements of Noland, Fletcher and Naylor. The report states the special master had "directed" the filing of the financial statements. On May 24, 1967, the bankruptcy court entered its order authorizing the sale of the North Wales-Ullman property to Noland; neither Naylor nor Fletcher was mentioned by name in this order. Also, it is undisputed that neither the bankruptcy court, the special master, nor the trustee had investigated the financial statements of Naylor or Fletcher, nor had they made any inquiry as to Naylor or Fletcher's position in the purchase of these properties. Both the special master and the judge, however, did state they relied on Fletcher's financial statement in recommending and approving the sale.

The closing date of the sale was set for June 23, 1967, at which time Noland defaulted. The trustee agreed to extend the closing until June 29, 1967 if Noland would increase his deposit from $5,000 to $100,000; however, Noland never increased his deposit, and a draft agreement extending the closing was never executed. On June 28, 1967, the trustee's report on account of the default was submitted to the bankruptcy court.

On June 30, 1967, the trustee wrote identical letters to Naylor and Fletcher, enclosing a copy of the report of default and a copy of a letter sent this same date to Noland. The letter to Noland had his $5,000 deposit enclosed, and stated that the trustee has determined to avail itself of its legal and equitable rights rather than retain the deposit as liquidated damages. At no time prior to the aborted closing did Noland or the trustee ask Fletcher to produce any of the purchase price, and Fletcher was not notified of the closing date. The trustee's letter of June 30, 1967 was its first communication with Fletcher, but it is noted this was only two days after the trustee reported the default. The trustee filed an application for specific performance and damages against Noland, Naylor, and Fletcher in the bankruptcy court on July 11, 1967.

The bankruptcy court, on September 19, 1967, entered an order in response to a new bid solicited by the trustee for the properties. The order referred the trustee's application for approval of the new contract of sale to the special master for hearing, and notice of the proposed hearing and resale was sent to several persons, including Fletcher. The hearing was held on October 5, 1967. Fletcher was not present at the hearing, and no other bids were received. By order dated October 27, 1967, the bankruptcy court approved the sale of the property to the successful bidder, National Land Company, for $1,700,000.

On February 12, 1971, a summary judgment was entered in the bankruptcy court in favor of the trustee against Noland in the amount of $246,354.54, which has not been satisfied. Fletcher was dismissed from that action because of lack of summary jurisdiction. A third party complaint against Fletcher was also dismissed to preserve Fletcher's right of trial by jury. The trustee then brought this diversity action against Fletcher as a copurchaser with Noland.

■ The trustee's first contention is that certain of the findings of fact made by the district court are clearly erroneous and must be set aside. F.R.C.P. 52(a). The district court found that: (1) there was nothing in the record indicating that the bankruptcy court relied on the financial statement of Fletcher, and that the court was unable to tell whether the special master had so relied in recommending that Noland's offer be approved, (2) there was "no evidence that Noland had any authority to use Fletcher's name or credit in re his bid to purchase the property in question," (3) there was no evidence that anyone thought Fletcher had any interest therein until some time after the resale to National Land Company, (4) Fletcher had received no notice of default prior to the entry of suit against him in the bankruptcy court on June 11, 1967. These findings of fact are clearly erroneous. Indeed, the written terms of the Noland-Fletcher agreement [1A] and the stipulations filed are to the contrary of each of them. The special master stated at a hearing September 27, 1967 he made the recommendation to the judge on the strength of the statements, and his report states his direction they be filed and their inclusion to the judge. The order of the judge entered June 9, 1970 recites its reliance on the financial statement of Fletcher. The Noland-Fletcher agreement itself is evidence of Noland's authority to use Fletcher's name and credit in the purchase of the property. The trustee notified Fletcher of the default on June 30, 1967, and instituted action against him for damages on July 11, 1967. Fletcher was notified of the resale offer and hearing thereupon. Again, the district court's finding that there was no evidence that anyone thought Fletcher had an interest until after the resale is clearly erroneous because the special master stated he had relied on Fletcher's statement, and the trustee had notified him of Noland's default, had sued him, and he had been notified of the resale and the hearing thereupon; all of these events transpiring at least weeks prior to the order approving resale.

■ In this diversity case, the forum being Virginia, and nothing to the contrary appearing in the record, the law of Virginia should apply. Klaxon Co. v. Stentor Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Moreland v. Moreland, 108 Va. 93, 60 S.E. 730 (1908); Waggaman v. General Finance Co., etc., 116 F.2d 254 (3rd Cir. 1940).

■ Under Virginia law, it is clear that Fletcher should be estopped to deny that he was a co-purchaser of the properties. Construing the evidence most favorably to Fletcher would indicate that Noland duped him into believing that he would be a mere straw man in the transaction, and would be paid $50,000 only for allowing Noland to use his (Fletcher's) financial statement (to misrepresent the facts to the court in order to buy the land), and (by purchase from Noland) to put the land temporarily in his (Fletcher's) name. Noland also promised Fletcher that he would not be obligated in any way.[2] However, none

---

**1A.** The written agreement appears in full as note 2.

**2.** Fletcher's agreement with Noland dated April 12, 1967, handwritten by Noland, reads as follows:

"I, Bruce Noland, do hereby promise to pay Keith N. Fletcher $50,000 for the use of his financial statement in the purchase of the North Wales and Ullman properties located at Fauquier County, Virginia.

"This statement will be presented along with Roger Naylor's and my own statement to the Referee in Bankruptcy, John A. Bresnahan.

of this changes the fact that Fletcher knew his financial statement would be used in purchasing the properties, it "will be presented . . . to the Referee in Bankruptcy," and knew the statement did not state any restriction on such use. Noland, of course, for obvious reasons, did not present the Fletcher agreement to the bankruptcy court.

■ In Virginia, the necessary elements of estoppel are: (1) there must have been a false representation or concealment of material facts; (2) the representation must have been made with the knowledge of the facts; (3) the party to whom it was made must have been ignorant of the truth of the matter; (4) it must have been made with the intention that the other party should act upon it; and (5) the other party must have been induced to act upon it. E. g., Coleman v. Nationwide Life Insurance Company, 211 Va. 579, 179 S.E.2d 466 (1971).

A consideration of the facts of this case, viewed in the light most favorable to Fletcher, reveals that Fletcher is estopped to deny his status as a purchaser of the property. It is admitted that Fletcher, for the stated consideration of $50,000, signed a financial statement knowing that it was to be used by Noland in the purchase of the property from the bankruptcy court and that it would be presented to the referee in bankruptcy. The material fact that Fletcher concealed from the statement was that he would not be obligated "in any way whatsoever regarding the purchase or resale" of the property; rather this was taken care of in the side agreement with Noland. Although Fletcher's present version of the matter is at some variance with the terms of his written agreement with Noland, it is undisputed that he was to be a silent partner in the purchase (he now contends he was to take the title to the property from Noland to hold as surety for his $50,000 consideration for the use of his financial statement).

■ It is undenied that the bankruptcy court was ignorant of the truth of the entire matter: the side agreement between Fletcher and Noland was never presented to the court. It is apparent from the agreement itself that it was intended that the bankruptcy court act on the financial statement: "This statement will be presented, along with Roger Naylor's and my own statement, to the Referee in Bankruptcy, John A. Bresnahan." The bankruptcy court, in fact, was induced to act upon the statement: it approved the sale to Noland, and the special master and the judge have acknowledged their reliance on the financial statement, it having been specifically requested by the special master. Any contention that Fletcher did not intend the bankruptcy court to act upon his financial statement is patently without merit. The contract provides that if Noland was not awarded the property by the bankruptcy court, then Fletcher would not receive his $50,000 payment. This whole scheme smacks of a rather apparent device to conceal from the bankruptcy court the true facts surrounding the purchase of the property, which has resulted in a loss to the creditors. Fletcher's position, according to the written agreement with Noland, is that for the consideration of $50,000 he would allow Noland to use his financial statement in the procurement of the property. If the bid were successful, he would receive $50,000 from Noland and not have any liability as to the purchase. In all events, *Fletcher was to be paid, then, for the use of his statement,* and if Noland misused the statement, which Fletcher had signed for a stated $50,000 consideration, Fletcher has only himself to blame and may not have the creditors

"My use of Keith N. Fletcher's financial statement is not intended to obligate Mr. Fletcher in any way whatsoever regarding the purchase or resale of any of the above property.

"If for any reason the Court does not award the sale of the above property to me, then this agreement shall be null and void.

/s/ Bruce Noland"

of the bankrupt estate milched out of their rights in a sale believed by the court to be bona fide.[3] Neither may he abuse the processes of the court with impunity. Had the financial statement been given by Fletcher without consideration, for example as an accommodation, the matter would be serious enough. For a stated consideration of $50,000, his conduct is inexcusable.

■■ The district court appears to have been impressed by the fact that the trustee did not rely on Fletcher's statement. That facet of the case presents no difficulty for the financial statement in question was requested by the special master, not the trustee. While it is true the trustee is an officer of the court, so also is the special master, who acted here to hear and recommend to the court. Furthermore, the portion of the act applicable to corporate reorganizations specifically requires the judge's approval of all leases or sales of the debtor's property. The trustee, then, is at no time more than an agent of the court, and the court makes the decision on whether or not to sell the property.[4] The failure of the trustee to rely on the financial statement is no excuse for the misrepresentation to the court, and concealment from it, of the true facts concerning the purchase.

To summarize, the trustee had solicited bids for the property, prepared a tentative agreement to sell to Noland, the highest bidder, if the court approved the offer, and then submitted the proposed agreement with Noland along with information pertaining to the other bids to the court. The court then referred the matter to the referee in bankruptcy, acting as a special master, for hearing and to receive additional bids. At this point, the matter was out of the trustee's hands. The special master did receive other bids, forcing Noland to raise his offer, and at the end of the bidding, the special master (for the first time in the negotiations) asked for the principals' financial statements. Noland then talked to Fletcher and acquired his financial statement, which he presented to the special master on the following day. It is a matter of record that the special master did consider Fletcher's financial statement in recommending approval of Noland's bid.[5] The special master then recommended to the court that Noland's bid be accepted, and the court, also considering Fletcher's statement, approved the special master's recommendation.

The special master and the court having relied on Fletcher's statement, which he intentionally submitted for that purpose, Fletcher became estopped to deny his status as a co-purchaser of the property.

Accordingly, the judgment of the district court must be reversed with instructions to enter judgment for the plaintiff in a proper amount.

Reversed.

3. In Thomasson v. Walker, 168 Va. 247, 190 S.E. 309, 313 (1937), is found a principle equally applicable to this case: "The general rule of equitable estoppel, or, as it is frequently called, 'estoppel in pais,' is that when one person, by his statements, conduct, action, behavior, concealment, or even silence, has induced another, who has a right to rely upon those statements, etc., and who does rely upon them in good faith, to believe in the existence of the state of facts with which they are compatible, and act upon that belief, the former will not be allowed to assert, as against the latter, the existence of a different state of facts from that indicated by his statements or conduct, if the latter has so far changed his position that he would be injured thereby." See also the language in Maryland Casualty Company v. Craig, 213 Va. 660, 194 S.E.2d 729, 732 (1973): "One who deals with an agent and has no knowledge of any limitations upon his power may deal upon the faith of his ostensible powers, whether this agency be general or special."

4. 11 U.S.C. § 75(a); 11 U.S.C. § 516(3); F.R.Civ.P. 53.

5. Although the record does not show how much weight the special master and the court placed on Fletcher's statement, it is only logical to assume that they were more impressed by statements showing a total net worth of over $5,000,000 than they would have been by Noland's net worth alone of $971,460 against a $1,900,000 bid.